## SALT LAKE CITY et al. v. GARDNER et al.

No. 2135. Decided February 1, 1911. On application for Modification of Decree, March 18, 1911 (114 Pac. 147).

1. WATERS AND WATER COURSES—WATER SUPPLY—UNAPPROPRIATED WATER—FINDINGS. Evidence *held* to authorize a finding that a certain lake contained an amount of unappropriated water at the time defendants made and filed their application to appropriate water therefrom in excess of the quantity applied for by them, and that in drawing such quantity defendants would not interfere necessarily with plaintiffs' rights as prior appropriators. (Page 40.)

2. WATERS AND WATER COURSES—APPROPRIATION—AMOUNT. Under Comp. Laws 1907, section 1288x20, providing that beneficial use shall be the basis, the measure, and the limit of all rights to the use of water in the state, the rights of prior appropriators

of the water of a lake as against subsequent applicants to appropriate water therefrom depends, not on how much the prior appropriators required, but on the amount they have applied to an original and beneficial purpose within a reasonable time after making their appropriation and prior to the time defendants applied for an appropriation. (Page 40.)

3. WATERS AND WATER COURSES—UNAPPROPRIATED WATER—RIGHT TO USE. Where a lake contained unappropriated water more than sufficient to supply an appropriation applied for by defendants in addition to the water applied to a beneficial use by prior appropriators, defendants were entitled to the granting of their appropriation, though the withdrawal of the water they required might necessitate a change in the methods or means used by the prior appropriators to withdraw the water to which they were entitled so as to permit the use of the surplus and unappropriated water by defendants. (Page 41.)

4. WATERS AND WATER COURSES—SUBSEQUENT APPROPRIATION—EXPENSE. Where the withdrawal of unappropriated water from a lake by subsequent appropriators required a change of methods or means by which prior appropriators were enabled to withdraw their water from a lake, and this entailed additional expense, such additional expense should be borne by the subsequent appropriators as a condition to their right to appropriate the unappropriated water. (Page 48.)

STRAUP, J., dissenting.

APPEAL from District Court, Fourth District; *Hon. J. E. Booth,* Judge.

Action by Salt Lake City and others against James A. Gardner and another.

Judgment for defendants. Plaintiffs appeal.

MODIFIED AND AFFIRMED.

*Rawlins, Ray & Rawlins, H. J. Dininny* and *P. J. Daly* for appellants.

*Thurman, Wedgwood & Irvine* for respondents.

FRICK, C. J.

This action was instituted pursuant to section 1288x14, Comp. Laws 1907, to determine the right of respondents to

appropriate a specific quantity of water from Utah Lake. In September, 1905, pursuant to section 1288x6, respondents duly made and filed with the state engineer their application to appropriate forty cubic feet of water per second of time from said lake. Appellants, pursuant to section 1288x9, duly protested said application, which protest the state engineer overruled and allowed respondents' application, whereupon appellants brought this action to determine respondents' rights to appropriate any of the waters of said lake as aforesaid.

Utah Lake is a rather shallow body of water which varies in depth from a few inches near the shore line to thirteen feet at its deepest part. The water covers an area of about ninety-three thousand acres, or approximately one hundred and fifty square miles. The lake is the lowest part of a drainage basin comprising an area of about three thousand square miles. The sole outlet of the lake is Jordan River with its source in the extreme north end of the lake, and thence flows in a northerly direction emptying into the Great Salt Lake. In the year 1882, each one of the plaintiffs, as separate corporations, and each in its own right and behalf, constructed certain canals into which they diverted a certain quantity of the water flowing from the Jordan River or Utah Lake and devoted such to a useful and beneficial purpose. The combined capacity of the canals aforesaid amounted to a flow of eight hundred and twenty-eight cubic feet per second. In addition to the foregoing corporations, other parties had also appropriated certain quantities of water from said lake in the manner aforesaid, and whose rights were prior to appellants', amounting to a flow of about one hundred and seventy-six cubic feet per second. In diverting the water, and for the purpose of obtaining a more regular as well as a more continuous flow from the lake into the Jordan River at its source, appellants caused a certain dam to be constructed at the point where the water of the lake flowed into the Jordan River, and in that way impounded the water in the lake, and thus, in certain seasons of the year, caused the water to rise and stand at a higher level. In

doing this, the water in the lake was caused to overflow some of the lower lands surrounding the lake, to which the landowners objected and insisted that the dam be removed or lowered. In 1885 a compromise was effected, and it was agreed between the water users and the landowners that the dam might be maintained at a certain height, which was fixed at three feet three and one-half inches above low-water mark, which point was designated "compromise point." This point is precisely three feet three and one-half inches above the bottom of Jordan River at the point where the water of the lake enters that stream.

It will thus be seen that, when the water in the lake rose so that it reached compromise point, the water users had to permit the water to flow into and through the Jordan River unmolested, and, when the water fell so that it was three feet three and one-half inches below compromise point, the water users could obtain no water by natural flow from the lake at the intakes of their canals, which were some distance north from the source of the Jordan River and along said stream.

In view of the foregoing conditions, the lake water flowed somewhat irregularly and in varying quantities into the Jordan River, and from that stream into the diverting canals of the plaintiffs. The varying quantities so flowing were determined by a series of measurements, from which the following results were obtained, namely: When the water in the lake stands at one foot above compromise point, the natural flow from the lake into the river is eight hundred cubic feet per second; when the water is only six inches above that point, the flow is six hundred and twenty-five feet per second; when the water stands at compromise point, the flow is reduced to five hundred and five feet per second; when it is six inches below that point, the flow is four hundred and ten feet per second, and at two feet below it is one hundred and eighty-seven feet per second, while at three feet below the flow is but eighty-two and a fraction cubic feet per second. As a matter of course, when the water fell below the bottom

39 Utah—3

of the Jordan River there was no natural flow at all.  For the purpose of overcoming the difficulty arising from the foregoing variation in the flow, and to obtain a regular flow of water from the lake into their diverting canals, plaintiffs, in 1902, installed a pumping plant at the point where the lake empties into the Jordan River, to which plant they have added from time to time after 1902 so that when this case was tried appellants had seven pumps installed with a combined theoretical pumping capacity of seven hundred cubic feet per second.

From various measurements that were made, it was also made to appear from the record that from 1887 to 1900 the water fluctuated in Utah Lake from being eleven inches above compromise point, the highest point reached, in June, 1893, to three feet one inch below that point, the lowest, in October, 1900.  During the term of years aforsaid there were only four years when the water rose above compromise point, namely, 1893, 1894, 1896, and 1897; and two years, to-wit, 1890 and 1899, when the water reached, but did not go above, compromise point; while in all the years it fell below that point during a large portion of each year. The average of all the measurements, as near as we can obtain it from the record, that the water fell below compromise point each year during the years aforesaid, was probably about eleven inches; while the average of all the measurements that the water rose above that point was about five inches.   The water, however, was above compromise point but a short time in each year.   In one year it was above that point for about sixty days; while in the other years the time did not exceed thirty days, which was during the high-water season.

It is important to bear in mind that from the foregoing measurements, which are not disputed by any one, there was no time, so far as the record shows, when the natural state of the water in Utah Lake was such as would permit a natural flow into Jordan River and from thence into the diverting ditches of appellants of the quantity of water claimed by them, namely, eight hundred and twenty-eight cubic feet

per second. The highest amount that would thus flow was during parts of the months of June and July, 1893, and May, 1897, at which times, however, less than eight hundred second feet would flow into the Jordan River. During two other months the flow of water was slightly in excess of six hundred feet, and during eleven months more the flow was between five hundred and six hundred feet, while during all the remainder of the time between December, 1887, and December, 1900, covering the whole period of the measurements, the flow was less than five hundred cubic feet per second into the Jordan River from the lake. Moreover, taking the period from 1893 to 1906, during which time an attempt was made to show the quantity of water that appellants diverted from their ditches and actually applied to a useful and beneficial purpose, the clear weight of the evidence is to the effect that appellants did not at any time take or use water in the amount allowed them in the decree by the trial court. In referring to the findings, it is manifest that the court allowed appellants all that the evidence showed that they were entitled to. Indeed, in the tenth finding which is excepted to, the court among other things found "that the aggregate number of acres which have been brought under irrigation by the plaintiffs (appellants) other than Salt Lake City is forty-nine thousand acres, and the maximum contemplated interests of the plaintiff (appellant) Salt Lake City will be fully satisfied by a quantity of water equal to thirty-six thousand acre feet supply during the irrigating season as heretofore defined at the head of said plaintiff's canal. . . . -That thirty-six thousand (36,000) acre feet, measured at the headgates of its canal, and used in such volume as from time to time may be necessary through the irrigation season, is a sufficient quantity of water to satisfy all the needs and necessities of the plaintiff, Salt Lake City. That one hundred and eighty-five thousand (185,000) acre feet, measured at the headgates of their canals, is a sufficient quantity of water, when used at such times and in such quantities as their necessities require, to satisfy the needs and necessities of the plaintiffs in this action for irrigation, municipal, culi-

nary, and all domestic purposes; the same being an equivalent of a continuous flow of approximately five hundred and fifteen (515) cubic feet of water per second during the irrigation season of one hundred and eighty days." The court also found that the highest amount of water that appellants took from the lake in any one year by means of their pumps and otherwise was in the year 1905, which approximately amounted to one hundred and thirty-six thousand acre feet or an equivalent of a continuous flow of about three hundred and seventy-three cubic feet per second for a period of one hundred and eighty days during the irrigation season. The findings go into great detail and will be referred to hereafter only in a general way.

So far as appellants' rights were concerned, the court decreed: "That, subject to the prior appropriations heretofore set forth in paragraph one, plaintiffs are jointly the owners of one hundred and eighty-five thousand (185,000) acre feet of water, flowing from and drawn from Utah Lake through the Jordan River, in Utah and Sale Lake Counties, Utah, during the irrigation season of approximately one hundred and eighty days in each and every year; said quantity of water being the equivalent of a flow of five hundred and fifteen (515) cubic feet of water per second continuously for a period of one hundred and eighty days." The appellants also have the right to use a specified amount of water from said lake during the remaining portions of each year. This is not material because it in no way is interfered with by respondents' claim, which is strictly limited to the irrigation season of one hundred and eighty days in each year. The court further found that there was a large amount of unappropriated water in Utah Lake at the time respondents made and filed their application; that said amount was in excess of the quantity applied for by them; and that they, in drawing the forty cubic feet per second of water from said lake, would not interfere with the rights of appellants as prior appropriators. The court also decreed: "That, subject to the rights hereinbefore set forth, defendants (respondents) are the owners of the right to draw and take from the waters of Utah Lake forty

(40) cubic feet per second continuously from the 1st day of April to the 1st day of November in each and every year, for irrigation, culinary and domestic use." The court also found the quantity of water that was necessary to supply the needs of appellants, which was fixed at a quantity "equal to three (3) acre feet per acre measured at the headgates of plaintiffs' respective canals."

Appellants strenuously insist that the following facts found by the court are either not supported by the evidence or are clearly contrary thereto, to-wit: (1) That there was unappropriated water in Utah Lake when respondents made their application; (2) that respondents will not interfere with appellants' prior rights in the use of the water; and especially (3) those relating to the amount of water used and required for their needs. As we view the matter, the finding that respondents will not interfere with appellants' prior rights in drawing forty cubic feet per second of water from Utah Lake is more in the nature of a conclusion of law than a finding of fact, and whether this conclusion necessarily follows from the facts as found, or whether it is sound or not, seems to us to be the real question to be determined. This question involves appellants' prior rights, which we shall consider hereafter. As to the other questions, we have carefully examined the evidence, and we cannot agree with counsel that the material findings of the court are not sustained by, or that they are contrary to, the evidence. Upon the contrary, we think that upon nearly all if not quite all, of the litigated questions, the findings of the court could not well have been to the contrary. That the court allowed appellants all that they were entitled to is well illustrated by the testimony of Mr. A. F. Doremus, a competent civil engineer, who, from personal knowledge and experience, was qualified to testify, and who was the leading witness for appellants. After showing his familiarity with the prevailing conditions as they affected appellants in the use of water, and especially the appellant Salt Lake City, the witness, as appears from appellants' abstract, testified: "The requirements per capita per day (for Salt Lake City) are about

three hundred gallons independent of the amount needed for
irrigation. The requirements for irrigation purposes are
about thirty second feet per day." Further: "The liabili-
ties of Salt Lake City for water during the irrigation season
for which it is dependent to a certain extent upon its city
canal are 18,000 acre feet, 9,000 acre feet, and 6,000 feet.
. . . The total requirements of the city then would be
12,000 acre feet for the irrigation of the city, 18,000 acre
feet for the sixty feet exchanged with Big Cottonwood, and
6,000 acre feet for the exchange with Parley's creek, making
a total of 36,000 acre feet." The court thus gave the city
all the water the witness said it required regardless of whether
it had already applied that quantity to a beneficial use or
not. The witness also testified with respect to the combined
requirements of all of the appellants, which he placed at
182,000 acre feet. The court by the decree, however, awarded
them 185,000 acre feet of which, as we have seen, Salt Lake
City was awarded 36,000 or nearly one-fifth of the amount.
We thus see that in this regard the court again added 3,000
acre feet to what the witness said were the combined require-
ments of all of the appellants.

The ultimate question for determination, however, is not
how much water appellants required, but what amount had
they applied to a useful and beneficial purpose for a term
of years prior to the time when respondents made their ap-
propriation? The evidence is conclusive that at no time dur-
ing all of the years commencing with 1885, when the com-
promise agreement was entered into, up to the year 1905,
when respondents made their application, had the appellants,
during the irrigation season, used and applied water in excess
of the amount decreed to them by the court. It may be pos-
sible that on some occasions in a few years when the water,
during the high-water season, rose considerably higher than
compromise point, more than five hundred and fifteen sec-
ond feet of water flowed into the diverting ditches of the ap-
pellants. The weight of the evidence, however, is to the effect
that such increased flow was not used by the appellants, or
by any of them. Moreover, appellants in entering into the

compromise agreement must be assumed to have known that when the lake stood at compromise point the natural flow therefrom was far less than the eight hundred and twenty-eight feet claimed by them; and further that, whatever that flow was, they could not increase it by impounding the water of the lakes so as to raise it above that point. The flow, when the lake stands at that point, as we have seen, is only five hundred and five second feet, and appellants therefore cannot claim more than that amount unless they by some artificial or other means have increased that flow and have applied the water to some useful and beneficial purpose. When the waters of Utah Lake rise above compromise point, it is entirely due to the fact that the flow of water into the lake from its sources of supply is larger than the discharge over the dam into the Jordan River and the loss by evaporation. This is a mere incident, and, as we have seen, occurred only a limited number of times since 1885, when the height of the dam and at which it may be maintained was established by the agreement which was still in force at the time of the trial, and which agreement is enforced as nearly as it can be by a commission appointed by the District Court of Utah County. The evidence that when the water is at compromise point the natural flow over the dam into the Jordan River does not exceed five hundred and five cubic feet per second is without conflict. It would seem, therefore, that, if appellants rely upon a natural or gravity flow of water from Utah Lake through the Jordan River, they are limited to a flow of five hundred and five cubic feet per second, since that is the greatest amount that will flow into the Jordan River from which their diverting canals lead when the water stands at the highest point permissible under the compromise agreement. No doubt appellants could by use have appropriated and acquired the right to use an amount or flow of water in excess of said five hundred and five cubic feet per second by drawing the same from the lake by means of their pumps. The evidence, as we have seen, however, is conclusive that they had not done so at any time prior to the time respondents made their application, and hence, un-

der the facts and circumstances of this case appellants should be limited to the amount of water they applied to a beneficial use, and not to an amount they could have claimed or require. Our statute ·(section 1288x20, Comp. Laws 1907) expresses the law upon that subject very tersely, in the following language: "Beneficial use shall be the basis, the measure, and the limit of all rights to the use of water in this state." The doctrine reflected in the foregoing statute has so often been declared to be the law with respect to the appropriation of water during the last twenty-five years that it has become elementary and is no longer questioned by anybody.

By what we have said we do not mean that an appropriator is limited to the amount of water he applies to a beneficial use during the first month, or even the first year, or perhaps a series of years; but he is limited to the amount he applies to a beneficial use if he has had a reasonable time in which to apply the water to such use; or, if the time when the water is to be applied to a beneficial use is fixed by statute directly or indirectly, then he is limited to the amount that he has devoted to such a use. within the time fixed. Under the facts and circumstances of this case, no **1, 2** question arises, and no claim is made, that appellants did not have a reasonable time in which to perfect their means through which the water sought to be appropriated by them could be and was applied to a beneficial use; nor does the evidence leave any reasonable doubt that there always has been, and perhaps always will be, a large amount of water in Utah Lake in addition to the amount claimed by .appellants and drawn from the lake by them as aforesaid; but whether such water is available to applicants therefor, and can be drawn from the lake either naturally or artificially without interfering with appellants' prior rights is the question we must determine. Appellants strenuously insist that to permit respondents to draw any water from Utah Lake by any means will necessarily interfere with appellants' rights, while respondents vigorously contend that from the evidence in the case it is made clear that appellants' contentions are not sustained. We are clearly of the opinion that

the court's finding or conclusion that Utah Lake, when respondents' application was made, contained a large amount of unappropriated water, is right. We are also clear that, if there is the amount of water applied for by respondents unappropriated and which can be drawn from the lake and applied to a beneficial use, without interfering with appellants' prior rights, then respondents should be permitted to take the water they ask for and apply the same to a beneficial purpose. We are likewise clear that in this arid region no water that is sought to be applied to a beneficial purpose should be permitted to go to waste unless it is clearly made to appear that it cannot be so applied without interfering with the prior rights of other users. If, however, such prior rights can be preserved by merely changing the methods or means through which the water of prior users is applied, then the methods or means used by them should be changed if they can be without interfering with a particular use so as to permit the use of the surplus and unappropriated water by the subsequent applicant therefor. We are also of the opinion that, if respondents are permitted to draw forty cubic feet per second of water from Utah Lake, appellants' prior rights can nevertheless be protected. Appellants, however, insist that their prior rights have not been sufficiently protected by the decree entered by the district court, and this seems to us to be the important question to be determined.

As we have seen, the amount of water in Utah Lake fluctuates. By reason of that, for a short period of the year, the amount that flows into it is greater than the amount that flows out, including evaporation, and hence causes the water to rise to and sometimes above compromise point, while during a larger portion of the year, by means of the pumping plant of appellants and through evaporation, the outflow exceeds the supply; and hence the water falls below that point, and sometimes considerably below it. The greatest variation shown by the record between the highest and lowest points that the water rose and fell is about six feet, or seventy-two inches. It is also shown that by far the greatest factor

in causing the fall of the water is evaporation, and only a comparatively small part of this fall is due to the drawing of water from the lake for irrigation and other beneficial purposes. In other words, about five feet of the water of Utah Lake is evaporated each year. It is also shown that a continuous flow of forty cubic feet per second of water for one hundred and eighty days from the lake would lower its surface when at compromise point about one and sixty-two hundredths inches, and as the lake falls, if this amount be continued to be taken from the lake, it will increase the lowering of the lake surface so that if the lake stands at three feet below compromise point the surface will be lowered two and sixteen hundredths inches, and, when the water stands at five feet below compromise point (which is about the lowest limit to which the water has fallen during the period of years aforesaid), the surface of the lake is thereby lowered two and eighty-eight hundredths inches. It is also shown that all the water drawn from the lake by appellants during a year will lower its surface less than two and one-half feet, perhaps not over two feet. There is evidence to the effect that appellants' pumps will be affected in their working capacity when the water in the lake is lowered to four and sixty-six hundredths feet below compromise point; but there is also evidence to the effect that in 1905 the water fell lower than that, namely, it had fallen to five and one-half feet below compromise point, and still the working capacity of appellants' pumps was not affected. It is, however, made to appear that the depth of the lake varies, and that the bottom of the lake south of and near the point where the pumps are placed is such as will be easily affected by the motion of the water, and hence may at any time interrupt the free flow of water from the body of the lake to the pumps, even when the lake is less than five feet below compromise point. At all events, appellants' pumps are all now so set that, if the water falls to about four and sixty-six hundredths feet below compromise point, their capacity to draw from the lake and to discharge water into the Jordan River so that it may reach the diverting canals of plaintiffs may be

seriously affected, and thus appellants may be prevented from obtaining the water necessary to supply their wants unless and until they make some alterations in or in some way again make available for use their pumping plant by dredging the bottom of the lake so as to cause the water to flow to the pumps.

To install the pumping plant as it was at the time of trial, appellants necessarily expended about $112,000. To change it in case the water fell below the point stated so as to make it again available for pumping would no doubt entail an outlay of an additional large sum of money, and with respect to dredging the bottom of the lake the evidence is in hopeless conflict, and the conditions assumed by the several experts are at such variance that it seems to us no one in advance can say either what the cost or the duration of such an experiment would be. While so far as the evidence shows, and unless conditions change, appellants' rights to the use of the quantity of water to which they are entitled would perhaps not be interfered with although respondents are permitted to draw forty cubic feet per second from the lake, yet those conditions may change, and the evidence leaves but little room to doubt that they may so change at most any time and may thus affect appellants in their rights in case present methods of drawing water from the lake are continued. As we view the evidence, such interference will perhaps only arise in extraordinary or abnormal conditions; but appellants' rights should be protected under such conditions if they arise as well as under natural or normal conditions.

By the foregoing we do not mean that, in view of the natural precipitation and the consequent inflow of water from that source into the lake, the amount of water in the lake when considered as a whole, will be so diminished by any act of respondents as will prevent appellants from obtaining in some manner the amount of water from the lake to which they are entitled by their prior rights. What we do mean is that, by reason of the acts of respondents in drawing their water from the lake, appellants may not at all times be able by their present means and methods to draw and obtain from

the lake the amount of water awarded to them by the court, and in order to obtain water sufficient for their needs, and to which they have a prior right, they may be required to apply additional mechanical energy and expend additional large sums of money annually. The questions, therefore, that present themselves, are: (1) In view that appellants may be affected in their rights as aforesaid, shall respondents therefore be denied the right to draw any water from the lake, and thus leave a large amount of water useless which otherwise will be put to a useful and beneficial purpose; or (2) shall respondents be permitted to draw the surplus water from the lake, and in doing so make appellants assume the risks incident thereto as outlined above; (3) shall respondents be given the right to the use of the surplus water to the extent asked for by them, and in so doing be required to assume all the risks incident thereto, and in case any of appellants' rights are invaded which can be protected and maintained by the expenditure of energy or money, or both, all such expenditures shall be borne and met by respondents before they shall be permitted to continue to take the proportion of the water allotted to them from the lake? In other words, ought not the prior rights of appellants in taking the water from Utah Lake be protected to the full extent, and the subsequent appropriators be made to bear all the expenses, if any, in case appellants are affected in any way in diverting their proportion of water from said lake so that appellants may obtain their full share of water without any increase of expense which may arise out of any subsequent appropriation?

Practically we have already answered the first proposition and will add only that, in our judgment, our statutes which relate to the use of the water for a beneficial purpose are to be liberally construed and applied, to the end that, when it is possible to apply to a beneficial use water which would otherwise be wasted where all prior rights can be preserved and protected, the right to appropriate such water should not be withheld. The doctrine is in strict harmony with and corollary to the doctrine announced by this court in *Nash*

*v. Clark,* 27 Utah 158, 75 Pac. 371, 1 L. R. A. (N. S.) 208, 101 Am. St. Rep. 953, where one water user, in order to make his appropriation available, was permitted, by condemnation proceedings, to acquire a right to the use of the ditches or means of diversion of a prior water user. It would seem that if it be once conceded that, in order to make his appropriation available, a subsequent claimant of water may by condemnation proceedings acquire an interest in or right to the use of the ditches, flumes, or other means of diversion belonging to a prior user, then the right to apply to a beneficial use water which cannot be so applied without in some way affecting prior rights, where such rights may nevertheless be protected and maintained, cannot well be questioned. Counsel for respondents, however, insist that the prior appropriator acquires no right in his means of diversion, but obtains a prior right only to use the quantity of water appropriated and applied to a beneficial use by him. We cannot yield assent to this view. We think the original taker or appropriator from a stream or body of water also acquires the right to continue to use his method or means of diverting which he has installed. If this be not so, then prior appropriators, who have appropriated only in small quantities, and whose means of diversion from the stream are simple but sufficient for their purpose, could have their means made entirely ineffective by a subsequent appropriator of a large volume of water the diverting of which would so lower the stream that the water would no longer reach the point of diversion of the small appropriator. In this way it may well be that the cost to the small appropriator to make the water appropriated by him available for his purpose might under changed conditions be prohibitive if not ruinous. Upon the other hand, the cost of making the change might not be so great as to prevent the larger appropriator from supplying and paying for some means whereby the prior rights to the use of the water appropriated by the small user might be preserved, and the wants of the large appropriator could nevertheless be met and supplied. In this way, perhaps, very large quantities of water theretofore

wasted, or used only to aid the original appropriator to obtain his meager supply, would be put to a useful and beneficial purpose without destroying the rights of any one. If it be held, therefore, that a subsequent appropriator of water need have no regard for the diverting means or methods of the prior appropriator, but may in fact or effect make prior appropriations of water unavailable with impunity, then there is in fact no such a right as a prior right, but all rights may, at any time, be invaded or destroyed by a subsequent appropriator by simply making the diverting means used by the prior appropriator useless. To permit such an invasion of a prior right would, in effect, amount to an indirect taking of a prior appropriator's water. This neither the legislative nor the judicial power can allow without permitting confiscation of property rights.

The contention of respondents' counsel that the case of *Natoma W. & M. Co. v. Hancock*, 101 Cal. 42, 31 Pac. 112, 35 Pac. 334, sustains the doctrine that a prior appropriator obtains no rights in his means of diverting water, and that he must so construct them as to leave all the water in the stream or body of water from which he draws his supply available for use without causing any interference with his means of diversion by subsequent appropriators, is, in our judgment, not tenable. The principle announced in that case does not go to such an extent. If that case, however, did go to the extent contended for, we should decline to follow it, because the doctrine would, in our judgment, be unsound. Upon the other hand, we are not prepared to agree with the claims of counsel for appellants as we understand them, namely, that a subsequent appropriation of water must be denied if to allow it would in any way or to any extent interfere with the prior appropriator either in depriving him of some of his water or in affecting him in applying it to the purpose for which his appropriation is made. No doubt no court could rightfully permit a subsequent appropriator to take any water already applied to a beneficial purpose by a prior appropriator; but we can see no good reason for denying a subsequent applica-

tion for unappropriated water simply because to allow such an application might require a change in the prior appropriator's means of diversion, provided such a change can be made without affecting the prior appropriator's ultimate rights of applying all of his water to the purposes selected by him. If all rights can be protected and preserved, a mere change in prior established means or methods of diversion, if possible, ought not to prevent the use of water which could otherwise not be beneficially applied. But, in our judgment, the risk of interfering with prior rights and the cost of any change in the prior appropriator's means or methods of diversion should be assumed and borne by the subsequent appropriator, and a court should in no case permit a subsequent appropriation unless all prior rights can by some feasible means be protected and maintained.

In the case at bar counsel for respondents concede that to some extent at least appellants may become affected in the use of the water appropriated by them. In their brief they say: "It is true that the appellants, in some seasons, might have to commence (pumping) a little earlier." From the evidence it is made to appear that the cost to pump the appellants' supply of water amounts to four thousand dollars a month. If, therefore, by reason of respondents' appropriation, appellants should be required to start their pumps but seven days and a fraction of a day sooner in any season, they would have to incur an expenditure of one thousand dollars in excess of what they otherwise would. It is true that, unless appellants can obtain all the water they need by gravity flow from the lake, they, under the circumstances, are practically deprived of taking any in that way. This is so because as soon as the pumps are set in motion the gravity flow of water ceases. From the evidence it is made apparent, however, that there may be seasons when the flow of water into the lake may for some time continue to be equal to both evaporation and the gravity outflow, and it may also be that this outflow in the early part of the irrigation season when the water stands at or near compromise point may be sufficient to supply all of appellants' needs,

were it not for the drawing of forty cubic feet per second of water from the lake at the particular time and under particular circumstances. Under such peculiar circumstances, therefore, it may be that appellants may be required to start their pumping plant by reason of respondents' appropriation. True it is that such a condition could not exist for any great length of time. But it matters not how short the time might be; it still would constitute an invasion of appellants' rights. We think, therefore, that under any of the circumstances referred to, or under any others where by reason of respondents' appropriation appellants may be adversely affected in the use of their water, or may be required to incur expenses in excess of what they would otherwise have to incur in obtaining their water supply from the lake, the respondents should assume the risk of such interference and should bear the expenses, if any, that may thus have to be incurred by appellants. If through respondents' acts appellants should be threatened with a shortage of water in any season, respondents should be required to refrain from taking any water until appellants' requirements (if within the quantity allotted to them) are met. Under no condition should respondents be permitted to take water from the lake until they can do so without interfering with appellants' prior rights. If respondents, however, can take the amount of water applied for by them from the lake without such interference, or they can make such an amount of water available by causing and paying for a change in appellants' means or methods of diverting their water from the lake, or in causing the water to flow to appellants' pumping plant as now constructed, then respondents should be permitted to do so under the direction and supervision of the court. In this connection we remark that, while we approve and affirm the findings of fact made by the court, we are, nevertheless, of the opinion that the rights of appellants are not sufficiently protected, nor are the duties of respondents sufficiently defined in the decree as it now stands. For the purposes, therefore, of correcting the foregoing defects in the decree, the cause is remanded to the district court

of Utah County with directions to modify the same in the following particulars:

To appoint some competent and suitable person to be designated "special court commissioner;" such commissioner to be selected by the parties to this action, or, in case they fail to do so within a reasonable time to be fixed by the court, then the court is to select and appoint such commissioner. Such commissioner, for the purposes of effectuating the provisions of this decree, shall have supervision over the waters of Utah Lake and over the pumping or diverting plants of the parties hereto, and shall have constant access to the plants aforesaid. He shall, upon the request of either party make measurements of the waters of Utah Lake, and shall ascertain and fix the amount of water taken therefrom by either of the parties hereto or others, and upon the request of appellants he shall forthwith ascertain whether the respondents are in any way or to any extent interfering with appellants' prior rights in the use of water from Utah Lake and in taking therefrom the amount of water allotted to appellants by this decree. He in this connection shall also determine whether the respondents, in taking the water allotted to them by this decree, are causing appellants to incur additional costs and expenses in obtaining and diverting the quantity of water allotted to them, and, in case he finds that such is the case, to notify respondents to forthwith advance to appellants such additional costs and expenses, or, in case the amount thereof cannot then be ascertained, to require respondents to adequately secure the payment of the amount aforesaid and to fix the time of payment thereof. Further, if such commissioner shall find that appellants are deprived of their full allotment of water by reason that respondents are taking the water from said lake, and that there is no way by which respondents can immediately supply such deficiency, then the commissioner shall forthwith notify the respondents to refrain from taking water from the lake, and they shall not be permitted to take any until appellants are secured the full quantity of water allotted to them. The no-

tices herein provided for shall be in writing and shall in
general terms state what is required of the party to whom
they are directed. In case any notice is given to any party,
and such party refuses or neglects to comply with the re-
quirements thereof within three days from the time of serv-
ice of such notice upon it, the commissioner shall forthwith
report the matter to the judge of the District Court of Utah
County, who shall immediately cause an order to be served
upon the delinquent requiring it to show cause within three
days why such delinquent should not comply with the orders
of the commissioner. In case the commissioner refuses or
neglects to act as required in this decree, the party request-
ing the action may apply to the district judge, who shall
forthwith cause the commissioner to appear before him and
show cause why he refuses or neglects to act, and, if the
court finds that he has failed to act when he should have
done so, the court shall direct him to act, and, in case he still
refuses, the court may punish him as for contempt and may
remove him from office. The court shall, from time to time,
fix the compensation of the commissioner and ascertain the
costs incurred in executing this decree, and shall direct the
amount fixed by the court to be paid to the commissioner, or
to the parties entitled thereto, by the party designated by
the court. The respondents shall pay all costs and expenses
incurred under this decree, including the compensation of
the commissioner as aforesaid, except in case the appellants
request the commissioner to act when there is no cause for
such action and the court so finds. In such case the court
shall fix the amount to be paid by appellants and shall direct
them to pay the same. The decree shall also conform to all
of the requirements of the foregoing opinion, and the court
shall upon the applications provided for in this decree, or
upon any application, hear the parties and the evidence pro-
duced by them and make such findings and conclusions of
law, and enter such orders and judgments, as may be just,
and shall enforce the same. The district court shall retain
full jurisdiction and control over this cause and all the par-
ties hereto with a view of effectuating the purposes of this

decree.   The parties hereto may by agreement in open court, or by stipulation in writing filed in the case, modify any of the stipulations of this decree or agree to different and addi-tional terms.   Each party to this action is required to pay his own costs of this appeal.

McCARTY, J. (concurring).

I concur in the foregoing opinion.   The evidence without conflict shows, in fact it is admitted, that when the water in the lake is at compromise point the gravity flow from the lake into the Jordan River is five hundred and five cubic feet per second.   Plaintiffs allege in their complaint, and the undisputed evidence shows, "that on the 19th day of October, 1905, the defendants filed their application to ap-propriate and pump a flow of forty (40) cubic feet of water from said lake, with Caleb Turner, state engineer for the state of Utah:   .   .   .   .that on the 20th day of June, 1906, .   .   .   the said Caleb Tanner, state engineer,   .   .   .   ap-proved said application and indorsed his approval thereon." When the defendants made their application, and at the time it was approved by the state engineer, plaintiffs had five pumps installed, four of which were installed in 1902, and the other, the fifth pump, in 1904.   The capacity of each of these pumps was one hundred cubic feet of water per second.   It will thus be observed that when defendants filed their application, and when it was approved by the state engineer, plaintiffs, as stated by the Chief Justice in the foregoing opinion, were entitled to a gravity flow of five hundred and five cubic feet, and, when the pumps were in operation, to five hundred cubic feet per second.   The un-disputed evidence shows that the pumps cannot be operated when the water in the lake is above compromise point.   And the evidence also shows, in fact it is conceded, that when the water in the lake falls below compromise point, and the pumps are put in operation, a gravity flow from the lake is an impossibility.   This is so because, if more water is

pumped than would be the natural gravity flow, the water level of the river is raised higher than the water level of the lake, and the pumped water would flow back into the lake. Hence, when the pumps are in operation, the gates, which extend across the river channel at the point where the pumping plant is located, are closed down, and all water pumped flows down the channel of the Jordan River to the headgates of plaintiffs' canals. In their brief counsel for the canal companies say: "From the necessities of the case there could not be concurrent gravity and pumping flow. When the pumps of plaintiffs are operated, the gravity flow must cease." In 1907, some two years after the initiation of defendants' rights, plaintiffs added two more pumps to their plant. The court found, and the evidence practically without out conflict, supports the finding: "That the irrigation season in Salt Lake County, Utah, where the lands of plaintiffs' stockholders are located, comprises a period of approximately one hundred and eighty days' duration, ordinarily commencing in April and ending in October, the date of its commencement, and ending varying in different years one with another by reason of climatic conditions; and where the volume of the flow of the waters used for irrigation is under the control of the irrigator during the entire irrigation season, *less water is required,* in irrigation seasons of normal climatic conditions, *during the early and latter part of such season, than during the major and intervening portion thereof.*"

It is suggested that at the time defendants filed their application with the state engineer (October, 1905) to appropriate and pump from the lake forty cubic feet of water per second, plaintiffs, and other prior appropriators not parties to this action, had acquired a vested right, as against defendants and other subsequent appropriators, to take and use about eight hundred cubic feet per second of the lake water. The proof offered at the trial, as I read the record, not only fails to support such claim or contention, but, on the contrary, the evidence, without conflict, shows conclusively that plaintiffs, as against the defendants, have not

acquired a right to take from the lake a greater quantity of
water than was decreed them by the court, namely, a quan-
tity not in excess of a continuous flow of five hundred and
fifteen cubic feet per second during the irrigation season.
The undisputed evidence shows that, when the water in the
lake is one foot above compromise point, the outflow is eight-
hundred cubic feet per second; that, when it is five tenths
of a foot above, the outflow is six hundred and twenty-five
cubic feet; that, when it is at compromise point, the outflow,
as hereinbefore stated, is five hundred and five cubic feet;
that, when it is six inches below, the outflow is four hundred
and ten cubic feet; and that, when one foot below, the out-
flow is three hundred and twenty-six cubic feet per second.
There have been only two years since plaintiffs' canals were
constructed in which the water in the lake rose one foot
above compromise point. The water level in the lake was
one foot above in 1884 and again in 1907. These were the
only two years in which it was possible for plaintiffs to fill
their canals to their full carrying capacity. A record was
made and kept showing approximately the different eleva-
tions of the water in the lake during the irrigation season
each year from 1888 to 1907 inclusive. In eleven of these
nineteen years, the water in the lake, during a short period
of the high-water season, rose above compromise point; but
at no time during the nineteen years, excepting in 1907, did
it rise to one foot above compromise point. There was
therefore only one season before the initiation of defendants'
rights when it was possible for plaintiffs to fill all their canals
to their full carrying capacity, and that was prior to the
compromise agreement of 1885. Under the decree of court
made and entered in conformity with the terms of that agree-
ment (*Salt Lake City v. Colladge,* 13 Utah, 522, 45 Pac.
891), plaintiffs cannot, in order to create a gravity flow in
excess of five hundred and five cubic feet per second, im-
pound the water of the lake and cause it to rise above com-
promise point. The record shows, and plaintiffs concede,
that during what is known as the low-water season, which
usually commences in the latter part of June or about the

first of July and continues through the balance of the irrigation season, the waters in the lake have almost invariably fallen far below compromise point, and that plaintiffs have been unable, during these low-water periods, to obtain an adequate supply. In their reply brief plaintiffs say: "In times past there have been seasons when the lake was at or below that level (compromise point), that it did not supply to plaintiffs and all their prior appropriators together, as much as twenty-five per centum of the capacity of plaintiffs' canals, and the evidence proves that the lake for many years has furnished less than an average of fifty per centum of the capacity of plaintiffs' canals for them and their prior appropriators, and this whether the water was taken from the lake into the river by natural flow or by pumps." And again they say: "The testimony on this subject is that the amount of natural outflow from the lake when at compromise point is five hundred and five cubic feet per second. For four years since the installment of the pumps the quantity pumped has been from three hundred and eight to four hundred and fifteen cubic feet per second only."

I have examined the record of this case with considerable care, and I fail to find any evidence that would sustain a finding by the court that the plaintiffs are entitled to a greater flow of water than was awarded them. A. F. Doremus, upon whose evidence plaintiffs mainly rely for a reversal or modification of the judgment in this case, in his testimony respecting the duty of water on the forty-nine thousand acres of land irrigated from plaintiffs' canals, exclusive of the Salt Lake City Canal, said: "While it is my judgment that it takes five acre feet to water the land in question, they never did have, during the time of this record, over three acre feet, because the men never had what water they needed." The court awarded the plaintiffs a little in excess of three acre feet of water per acre for the forty-nine thousand acres mentioned; that is, the court decreed plaintiffs the maximum amount of water that the evidence showed they had appropriated and used. Not only did the court award the farmers all the water the evidence showed they

were entitled to, if not more, but it was equally liberal with Salt Lake City. Mr. Doremus, in his testimony respecting the "requirements of the city," said: "The liabilities of Salt Lake City for water duing the irrigation season for which it is dependable to a certain extent upon its city canal are eighteen thousand acre feet, nine thousand acre feet, and six thousand acre feet," making in all thirty-three thousand acre feet. The court, however, awarded Salt Lake City thirty-six thousand acre feet.

The undisputed evidence shows that from 1893 to 1901, inclusive (the eight years next preceding the installation of the pumps), the approximate outflow of the lake in acre feet during the irrigation season of each of those years was as follows:

| | | |
|---|---|---|
| 1893 | ...........................160,482 acre feet |
| 1894 | ...........................121,987 " " |
| 1895 | ........................... 94,922 " " |
| 1896 | ...........................125,185 " " |
| 1897 | ...........................141,158 " " |
| 1898 | ...........................109,059 " " |
| 1899 | ...........................117,887 " " |
| 1900 | ........................... 75,292 " " |
| 1901 | ........................... 56,274 " " |

The amount taken from the lake by plaintiffs from 1903 to 1906 inclusive, a period during which the pumps were in operation, was as follows:

| | | |
|---|---|---|
| 1903 | ...........................101,271 acre feet |
| 1904 | ...........................120,337 " " |
| 1905 | ...........................135,969 " " |
| 1906 | ...........................128,472 " " |

The record does not disclose the amount of water in acre feet taken by the plaintiffs into their canals during the irrigation season of 1902, but it does show that the quantity was small as compared to the amount taken by them in other years. During May and June (the high-water season) of that year the outflow from the lake was approximately one hundred and fifty-four cubic feet per second.

The court awarded plaintiffs one hundred and eighty-five thousand acre feet of water per annum which must be supplied to the plaintiffs before defendants are permitted to take any water from the lake. It will thus be seen that plaintiffs were awarded nearly twenty-five thousand acre fee of water per annum more than they had used during any one of the thirteen years mentioned.

That the plaintiffs were awarded all the water to which they are entitled may be better illustrated as follows: The amount of water used by plaintiffs these thirteen years would be equivalent to a yearly average of about one hundred and fourteen thousand five hundred acre feet, which is seventy thousand five hundred acre feet less than the amount awarded them per year by the decree. In other words, plaintiffs are given seventy thousand, five hundred acre feet more, per year, than the general average amount used by them during the thirteen years mentioned.

The claim that there is no unappropriated water in the lake is equally as unfounded as the claim that the plaintiffs have acquired a vested right to a continuous flow therefrom of eight hundred cubic feet per second during the irrigation season. Not only does the record conclusively show that there are unappropriated waters in the lake far in excess of the amount the defendants are entitled to take therefrom, but that the supply of water in the lake will, in all probability be greatly augmented on the completion of what is known as the "Strawberry Project," which is being constructed by the government. The evidence shows that when this project is completed at least fifty thousand acre feet of water per annum now flowing into the Colorado river will be applied to arable lands adjacent to the lake. This water is to be taken from streams, tributaries of said Colorado river, and conveyed by means of a tunnel through the mountains to the Utah Lake basin.

Reference is made to applications allowed by the state engineer to parties not connected with this action to appropriate

eight hundred cubic feet per second of the lake water. These applications were not in issue, and were neither directly nor indirectly involved in the action. They were only incidentally referred to at the trial and can have no bearing whatever on the questions presented by the appeal. By an examination of the record, however, it will be seen that six hundred of the eight hundred cubic feet is for power purposes only, and will not diminish the supply of water for irrigation purposes. The record does not disclose what use is to be made of the other two hundred cubic feet.

STRAUP, J. (dissenting).

I dissent. There is no question that the plaintiffs, together with other appropriators, representing a large number of water users in the vicinity of Salt Lake Valley and of Salt Lake City, were the first appropriators of the waters of the lake. Their appropriations were made in 1882 and prior thereto. The extent of plaintiffs' appropriations are alleged to be eight hundred and twenty-eight cubic feet per second; and of those having rights prior to theirs, one hundred and seventy-six cubic feet per second. The plaintiffs take their water from the lake at the north end through the Jordan River by means of the natural or gravity flow and by pumping. In 1906 the defendants filed an application with the state engineer to appropriate, and to divert from or near the south end of the lake, forty cubic feet per second of the waters of the lake, by means of pumping. The engineer allowed the application. At about the same time he also allowed similar applications to others amounting in all to eight hundred cubic feet per second, equal to about three hundred and twenty-eight thousand acre feet in one hundred and eighty days. The plaintiffs thereupon brought this action alleging that there was no available unappropriated waters of the lake after the supply and diversion of the waters of the plaintiffs, and of those who had acquired rights prior to the alleged appropriations of the defendants, and that the proposed diversion and use of the waters by the defendants would conflict and interfere with existing and vested rights

of the plaintiffs. The proposed appropriation of the defendants was thereupon asked to be annulled, and their proposed diversion of the waters was sought to be prevented. The court found that the plaintiffs were entitled to but five hundred and fifteen cubic feet per second of the waters of the lake during the irrigation season of one hundred and eighty days, approved the defendants' appropriation of forty cubic feet per second, and in effect held that the proposed diversion and use of the waters, as proposed by the defendants, would not interfere with the prior rights of the plaintiffs. I think these findings are against the weight of the evidence. I think the plaintiffs are shown to be entitled to about eight hundred cubic feet per second of the waters of the lake.

I am further of the opinion that, under the physical conditions existing at the time of the defendants' proposed appropriation, no water from the lake could be diverted or pumped by them, when the level of the lake is between compromise point and low-water mark, without interfering with and diminishing the volume of gravity flow from the lake into the channel of the river; neither could such waters be diverted by them at such time without interfering with and impairing the efficiency of plaintiffs' pumps, unless the bottom of the lake should be dredged and excavated at or near its outlet into the Jordan River. These propositions respondents do not in substance dispute. In answer to the first, they say that the plaintiffs have no vested rights in or to the natural or gravity flow from the lake into the river, and, if the defendants' proposed diversion interferes with such flow then, the defendants in effect assert that the plaintiffs must be content to pump the water from the lake into the channel of the river. And in answer to the second they in effect assert that if the diversion of the water by them at the point of their diversion so lowers the waters at the point of plaintiffs' diversion that the efficiency of their pumps is interfered with, then let the plaintiffs dredge and excavate the bottom of the lake at such point, thereby causing the water at lower portions of the lake to flow to and become available for their pumps. In other words, there being more

water in the lake than is necessary to supply the legal demands of the plaintiffs and other prior appropriators, the defendants conceived the idea that if they, by diverting water, but leave enough in the lake to supply such prior rights, then plaintiffs' rights have not been interfered with by the defendants, though the plaintiffs, because of the defendants' diversion of water from the lake at the point of their diversion, may be required to do more pumping, or to dredge the lake to get the water to their pumps. I cannot yield assent to such a doctrine. Furthermore, I think it is very clearly shown by the evidence that dredging the bottom of the lake at or near the place of plaintiffs' diversion is utterly impracticable on account of the character of the bottom of the lake, and would cost, as variously estimated, from sums of seventeen thousand to one million dollars.

I readily assent to the view that the excess of unappropriated waters in the lake should be permitted to be diverted and applied to a beneficial use by subsequent appropriators when the diversion of such excess is practicable and available without interfering with substantial vested rights of prior appropriators. But such subsequent appropriators have the burden of showing that such a diversion can be made without such interference. This the respondents have completely failed to do. To the contrary, I think it is clearly shown that their proposed diversion would necessarily interfere with the prior vested rights of the plaintiffs. If the defendants, and other subsequent and similarly situated appropriators, shall be permitted to pump and divert from the lake eight hundred cubic feet per second of water, the result is inevitable that the plaintiffs will be obliged to dredge the lake or to reset and reinstall their pumps and change their point of diversion. To permit them to make the diversion under such circumstances, and leave the plaintiffs to seek redress at the hands of the courts for an interference with their rights, but breeds litigation. What the plaintiffs need, and what they are entitled to, is not a lawsuit, but the use of the waters appropriated by them more than a quarter of a century ago. And, before respondents should be allowed to

divert an excess of unappropriated waters of the lake, they must first show that the diversion can be made without interfering with the vested rights of the prior appropriators. This they have not done. I therefore think that the plaintiffs are entitled to the relief prayed for by them.

### ON APPLICATION FOR MODIFICATION OF DECREE.

**FRICK, C. J.**

Appellants have applied for a modification of the decree rendered by us in this case upon the ground that it is not sufficiently specific and certain. As we understand the application, what appellants desire is that we enter a decree requiring the respondents to make and constantly maintain a channel of a certain depth in the bottom of the lake and leading to appellants' pumps, whether respondents in pumping their forty second feet of water from the lake interfere with appellants' use of their pumping plant to its full capacity or not. In this connection, appellants' urge upon us the statement made by Mr. Justice Straup, in his dissenting opinion, namely, that "what appellants need, and what they are entitled to, is not a lawsuit, but the use of the waters appropriated by them more than a quarter of a century ago." No doubt if we had the power and were inclined to exercise it by turning over to appellants the exclusive dominion and control of Utah Lake, and if we in connection therewith could prevent all persons from in any way interfering with that dominion and control, it might perhaps be possible for us to prevent all future lawsuits against appellants, provided every person strictly respected and obeyed the provisions of any judgment we might render in that respect. In considering the case we were, however, compelled to find and to decree (of which finding appellants do not complain) that respondents have some rights in the waters of Utah Lake, and, in order to make such rights available, they were given access to the waters of the lake upon the condition that they should not interfere with appellants' prior rights. These rights we sought to guard and protect in

every possible way. We cannot, however, impose conditions upon the respondents in exercising their rights which to us seem unnecessary and inequitable, and which would in effect nullify such rights. To require respondents to maintain at all times a channel at a certain depth before they should be permitted to take any water from the lake, whether such a channel is in fact required to protect appellants' rights or not, but is demanded merely to guard against a speculative contingency that may never arise, is to our minds placing a needless and unjust burden upon the exercise of respondents' right to take their water from the lake. We think appellants are given every reasonable protection they are entitled to. Moreover, the court is always open and available to them for the purpose of enforcing their rights under the decree. If the provisions of the decree, when applied to the prevailing conditions, shall be found to be defective or insufficient to protect appellants' rights, and application for a modification thereof is then made so as to effectuate its purpose in safeguarding their prior rights, the court may then act upon such application. In making any changes, however, they should be based upon actual conditions and experience, so far as these may be shown, and the rights of all parties kept in mind.

We see no good reason why the decree should be modified.

The application therefore should be denied. It is so ordered.

McCARTY, J., concurs.

STRAUP, J. (dissenting).

Considering the case now upon the views alone as expressed in the prevailing opinion, I think the judgment or decree of the majority members ought to be made more specific and certain. That the appellants had acquired prior rights in and to the use of the ascertained quantity of waters of the lake was not disputed. It was decided, and conceded by all concerned, that "under no condition should respondents be permitted to take water from the lake until they can

do so without interefering with appellants' prior rights." Besides the quantity of waters of the lake, in and to the use of which appellants had acquired rights, the principal disputed and litigated question in the case was as to whether respondents' proposed diversion of waters, under the conditions and in the manner stated in their application for an appropriation, and as shown by the record, would constitute an interference with appellants' rights. It was asserted by appellants, on the one hand, and denied by respondents, on the other, that such proposed appropriation and diversion would interfere with such rights. The issue raised on such asserted and denied claim was what chiefly gave rise to this lawsuit. The lower court held that respondents' proposed appropriation and diversion would not interfere with any of appellants' rights. The majority members of the court held that such a conclusion was not justified—at least not to so full an extent—and that the rights of appellants were not fully guarded and protected by the judgment or decree of the court below. Views are expressed by them that under certain conditions the respondents' proposed diversion of waters of the lake would not interfere with appellants' rights, and that under other conditions such diversion might interfere with such rights, or cast on appellants increased burdens. Appellants, in their petition for a rehearing, have therefore requested that, upon the record and as disclosed by the evidence, such conditions be ascertained and determined. Accordingly, they have suggested that the directed judgment or decree be so modified as to adjudge "that hereafter during any season of any year, whenever the level of the lake shall be at, or below, 'compromise point,' so called, the defendants shall not pump or divert water from the lake, unless before that they shall have, by cuts or dredgings in the lake, or by such other effectual means as they may adopt, rendered the surplus water in the trough of the lake, in as much quantity at least as they shall divert therefrom, available to use and caption at the place where the plaintiffs' pumps are now installed; and upon their failure to so make said surplus water available in the quantity afore-

said, at the time aforesaid, and at the place aforesaid, the said defendants and their successors in title and interest shall be, and they hereby are, forbidden to pump or divert water from the lake, during any season of that year, or until the level of the lake shall have again risen above compromise point; provided that it shall be the duty of the plaintiffs herein, and their successors in interest and title, to maintain their dams at or near the outlet of said lake, as they have heretofore done for the storage of water in said lake."

If it is thought that such a judgment would not be supported by the record, or would not be in harmony with the views expressed in the prevailing opinion, I think a specific and definite judgment ought to be made which would be in accordance with such views and the record. Not to do so, I am afraid, leaves the litigants on the chief issue—whether respondents' proposed diversion will constitute an interference with appellants' rights—just where they were before this lawsuit was had.

I therefore think we ought to grant a rehearing and further examine the case.