2010 UT 37

Melvin BINGHAM, Glenda Bingham, Howard Horrocks, Ila Faye Horrocks, Virginia Houston, Fern Oberhansly Labrum, Kent Nelson, George Richins, and Loraine Richins, Plaintiffs and Appellants,

v.

ROOSEVELT CITY CORPORATION, Defendant and Appellee.

No. 20081061.

Supreme Court of Utah.

May 14, 2010.

J. Craig Smith, Kathryn J. Steffey, Bryan C. Bryner, Salt Lake City, for plaintiffs.

David L. Church, Salt Lake City, for defendant.

Donald E. McCandless, Provo, for amici Living Rivers and Great Basin Water Network.

DURRANT, Associate Chief Justice:

## INTRODUCTION

¶ 1 In this case, several individuals who own property in the North Hayden Area (collectively, the "North Hayden Group" or the "Group") appeal the district court's grant of summary judgment against them. The North Hayden Group alleges that nearby Roosevelt City (the "City") has diverted water from the Neola–Whiterocks aquifer in a manner that lowers the surrounding water table and makes the soil less saturated. This diminution in soil saturation, the Group alleges, has made it more costly for Group members to irrigate their land and has impaired their ability to raise crops and livestock. The Group's complaint asserted that the City's pumping was negligent, interfered with the Group's water rights, and amounted to an unconstitutional taking of the value of the Group's property. The City moved for summary judgment on several grounds. First, it contested the Group's takings, interference, and negligence claims on their merits. It also asserted that the Group's claims were barred by the relevant statutes of limitations and that the Group's interference claim was barred by Utah's governmental immunity statutes. The district court granted summary judgment in favor of the City with regard to all of these issues. The North Hayden Group appeals. We affirm in part and reverse in part.

## BACKGROUND

¶ 2 In 1983, Roosevelt City purchased property, including two wells and the associated water rights, in the North Hayden area.[1] After purchasing the property, the City filed various change applications with the Utah State Engineer to change the point of diversion for two of its existing water rights to the location of the two wells. The City rehabilitated and deepened the two existing wells and eventually drilled three additional wells, culminating in five wells known collectively as the Hayden Well Field. Members of the North Hayden Group protested the change applications filed with the Office of the State Engineer and also protested the drilling of the additional three wells. Despite these protests, by the fall of 1990, all five wells in the Hayden Well Field were pumping water for the City.

¶ 3 The wells that constitute the Hayden Well Field draw water from the Neola–Whiterocks aquifer, an unconfined, shallow aquifer underlying the Hayden area. Historical data indicate that, before the Hayden Well Field was established, the static water level in the area was 14.3 feet below ground surface. In the years since the wells became active, this level has dropped dramatically;

1. Because the North Hayden Group appeals from the district court's grant of summary judgment, we present the facts, in a manner consistent with rule 56 of the Utah Rules of Civil Procedure, "in the light most favorable to the nonmoving party." *Orvis v. Johnson,* 2008 UT 2, ¶ 6, 177 P.3d 600 (internal quotation marks omitted); *see also Mountain States Tel. & Tel. Co. v. Atkin, Wright & Miles, Chartered,* 681 P.2d 1258, 1261 (Utah 1984) ("Doubts, uncertainties or inferences concerning issues of fact must be construed in a light most favorable to the party opposing summary judgment.").

in 2008 the water level at one of the wells was 94.6 feet below the surface. This change is the result of the geologic and hydrologic characteristics of the area. One key characteristic of unconfined aquifers, like the Neola–Whiterocks aquifer, is that water can be drawn through the soil into the aquifer. Thus, if water is extracted from the aquifer more quickly than it is naturally replenished, the water table in the surrounding area will drop. Because of the nature of this phenomenon, the underground area of reduced soil saturation is in the shape of an inverted cone, with the point of the cone extending downward toward the point at which the water is extracted. Accordingly, the depth of the water table will be most significantly impacted at the point of extraction, but even as one moves away from this point, the water table will be lower than it otherwise might be. Therefore, the effects on the water table are apparent even on parcels of land that are not immediately adjacent to the wells.

¶ 4 This type of aquifer is different from a confined aquifer. Confined aquifers are separated from the adjacent soil by a layer of less permeable stone. When confined aquifers are depleted, this layer of less permeable material prevents water from being drawn into the aquifer through the soil. This in turn makes the impact on the water table in the surrounding area far less dramatic. The North Hayden Group asserts that beneath the Neola–Whiterocks aquifer, there exists a confined aquifer—the Duchesne River Formation—from which the City could extract its water without so dramatically impacting the water table in the surrounding area. But because the wells extract water instead from the unconfined aquifer, each additional year of pumping causes the water table to continue to decrease.

¶ 5 Members of the North Hayden Group have suffered various injuries as a result of this change in the water table. After the wells were put into production, trees and grass died. Members of the Group are no longer able to irrigate their lands effectively because the irrigation water is now quickly absorbed and drawn deep into the soil, past the root systems of the crops and pasture vegetation, to replenish the aquifer. Thus, raising crops and livestock is much more costly in some instances and practically impossible in others.

¶ 6 The North Hayden Group filed suit against the City on June 3, 2004, seeking damages and injunctive relief. The Group asserted three causes of action: interference with water rights, takings, and negligence. The complaint did not allege that the City used any water right or water source for which it did not have an approved water right certified by the State Engineer. Nor does the Group claim any interest in the water being appropriated by the City. Rather, the Group claimed that it has various interests in other water rights and that the City's actions have had a negative impact on these water rights. Specifically, because its members' water is being drawn down through the soil, the Group asserted that the quantity of water to which they are entitled is no longer sufficient to irrigate their land effectively.

¶ 7 As a result, the Group claims that its members can no longer grow hay, pasture their cattle, or derive income from their properties, and that both their water rights and land have lost substantially all of their value. The Group members alleged that these losses were a result of the continuous pumping of the Hayden Well Field, which lowered the water table under their properties.

¶ 8 The City moved for summary judgment based on a number of theories. First, the City challenged the merits of each of the Group's claims. With regard to the Group's takings claims, the City argued that the property interests asserted by the Group are not protected by the takings clauses of the United States and Utah Constitutions. With regard to the Group's claim of interference, the City argued that the Group could not prevail on such a claim because the undisputed facts show that the City is pumping water that it has lawfully appropriated and to which the Group has no rights. The City challenged the Group's negligence claim by arguing that it did not owe the Group any duty to preserve the water table at historic levels.

¶ 9 The City also argued that the Group's claims were barred by the applicable statutes

of limitations because the wells were drilled decades ago and the Group members for years have known, or should have known, that the City's pumping was causing the harms alleged in this case. Finally, the City argued that the Group's interference claim was barred by the Governmental Immunity Act of Utah. The district court ruled in favor of the City on each of these issues. On appeal, the North Hayden Group challenges all of these determinations. We have jurisdiction pursuant to Utah Code section 78A–3–102(3)(j) (2008 & Supp.2009).

## STANDARD OF REVIEW

¶ 10 "An appellate court reviews a trial court's legal conclusions and ultimate grant or denial of summary judgment for correctness and views the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." [2]

## ANALYSIS

¶ 11 In analyzing the district court's grant of summary judgment, we address each issue in turn. We begin by addressing the Group's takings claim. We then address the Group's claim that Roosevelt City's conduct constitutes interference with the Group's water rights. Although we affirm the district court's grant of summary judgment in favor of the City with regard to these two claims, we find that the district court erred in its analysis of the Governmental Immunity Act of Utah. We then address the Group's negligence claim. Finding that the continuing tort doctrine applies, we hold that the district court erred in its determination that this claim was barred by the statute of limitations. Finally, we hold that the City owes a duty of reasonable care to parties who will foreseeably be injured by its method of diverting water. Accordingly, we reverse the district court's determination to the contrary and remand for further proceedings.

## I. THE NORTH HAYDEN GROUP HAS NOT SUFFERED A COMPENSABLE TAKING AS A RESULT OF ROOSEVELT CITY'S USE OF LAWFULLY APPROPRIATED WATER RIGHTS

¶ 12 The City's diversion of water, even to the extent it has lowered the water table and altered the amount of water in the soil, has not unconstitutionally taken property from the North Hayden Group. The Group contends that both the Utah Constitution and the United States Constitution prohibit the City from negatively impacting the water level in the Group members' soil without providing just compensation for the corresponding diminution in property value. The district court disagreed, concluding that the Group members have no protectable interest in the level of water in the soil beneath their land. We affirm.

¶ 13 Both the Utah Constitution and the United States Constitution provide protection against a government taking of private property. Article I, section 22 of the Utah Constitution provides that "[p]rivate property shall not be taken or damaged for public use without just compensation." The Fifth Amendment to the United States Constitution provides that private property shall not "be taken for public use, without just compensation." The North Hayden Group correctly points out that different levels of protection arise from these distinct constitutional guarantees. For instance, because the Utah Constitution bounds the ability of the government not only to "take[ ]," but also to "damage[ ]," private property, we have characterized this state constitutional provision as being broader than its federal counterpart.[3] When determining whether government action has violated article I, section 22 of the Utah Constitution, we inquire whether there has been " 'any substantial interference with private property which destroys or materially lessens its value, or by which the owner's

---

**2.** *Orvis v. Johnson*, 2008 UT 2, ¶ 6, 177 P.3d 600 (citation and internal quotation marks omitted).

**3.** *Bagford v. Ephraim City*, 904 P.2d 1095, 1097 (Utah 1995) ("This provision is broader in its language than the similar provision in the Fifth Amendment of the United States Constitution.").

right to its use and enjoyment is in any substantial degree abridged or destroyed.' " [4]

¶ 14 The Fifth Amendment to the United States Constitution "prohibits the government from taking private property for public use without just compensation." [5] In the language of this prohibition itself, the requirement can clearly be found that the government must pay compensation for an actual physical appropriation or permanent physical occupation of land.[6]

■■ ¶ 15 Beyond this, the jurisprudence of the United States Supreme Court has also established that government regulation that goes "too far" will also constitute a taking of the regulated land.[7] Thus, just compensation must be awarded if government action deprives a landowner of all economically beneficial use of his land.[8] Even short of a deprivation of all economic value, landowners who suffer a substantial deprivation as a result of government regulation of their property may be entitled to compensation under the Fifth Amendment.[9] Determining whether this sort of "regulatory taking" has occurred "depend[s] on a complex of factors including the regulation's economic effect on the landowner, the extent to which the regulation interferes with reasonable investment-backed expectations, and the character of the government action." [10]

¶ 16 But the standards for finding a taking under both the United States and Utah Constitutions begin with a fundamental inquiry that is only implicit in these oft-stated standards. That fundamental question is whether the thing taken—whether it be land, economic value, or a right to use property in a particular way—qualifies as property within the meaning of each of these constitutional provisions. To this end, we have held that the prohibition on takings found in the Utah Constitution applies only to "protectable interest[s] in property." [11] Similarly, in a line of cases, the United States Supreme Court "has dismissed 'taking' challenges on the ground that, while the challenged government action caused economic harm, it did not interfere with interests that were sufficiently bound up with the reasonable expectations of the claimant to constitute 'property' for Fifth Amendment Purposes." [12]

¶ 17 Stated plainly, in order to be entitled to compensation for the change in the level of

4. *Colman v. Utah State Land Bd.*, 795 P.2d 622, 626 (Utah 1990) (quoting *State ex rel. State Road Comm'n v. Dist. Court, Fourth Judicial Dist.*, 94 Utah 384, 78 P.2d 502, 506 (1937)).

5. *Palazzolo v. Rhode Island*, 533 U.S. 606, 617, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001).

6. *See Tahoe–Sierra Pres. Council v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 321–22, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002) ("The text of the Fifth Amendment itself provides a basis for drawing a distinction between physical takings and regulatory takings. Its plain language requires the payment of compensation whenever the government acquires private property for a public purpose.... But the Constitution contains no comparable reference to regulations that prohibit a property owner from making certain uses of her private property.").

7. *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1014–15, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) (quoting *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922)).

8. *See id.* at 1015, 112 S.Ct. 2886 (One situation in which the Court has "found categorical treatment appropriate is where regulation denies all economically beneficial or productive use of land.").

9. *See Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 123–24, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (determining that whether "justice and fairness require that economic injuries caused by public action be compensated by the government" depends upon the "particular circumstances" of a given case (citations and internal quotation marks omitted)).

10. *Palazzolo*, 533 U.S. at 617, 121 S.Ct. 2448.

11. *Bagford*, 904 P.2d at 1097–98 (citing *Farmers New World Life Ins. Co. v. Bountiful City*, 803 P.2d 1241, 1243–44 (Utah 1990); *Colman*, 795 P.2d at 625); *see also Strawberry Elec. Serv. Dist. v. Spanish Fork City*, 918 P.2d 870, 877 (Utah 1996).

12. *Penn Cent.*, 438 U.S. at 124–25, 98 S.Ct. 2646 (citing *United States v. Willow River Power Co.*, 324 U.S. 499, 65 S.Ct. 761, 89 L.Ed. 1101 (1945); *Demorest v. City Bank Farmers Trust Co.*, 321 U.S. 36, 64 S.Ct. 384, 88 L.Ed. 526 (1944); *United States v. Chandler–Dunbar Water Power Co.*, 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063

soil saturation, the Group must prove that it has an interest that garners the protections of one of these constitutional guarantees. We look first to the Group's claims under the Utah Constitution. Finding that the Group's interest is not protectable under article I, section 22, we next examine the Group's claims under the federal constitution. We conclude that the Group's interest in the water table underlying its property is also not within the protections of the Fifth Amendment.

*A. The Utah Constitution Does Not Provide Protection for the Group's Claimed Interest in the Level of Water in Its Soil*

■ ¶ 18 The level of soil saturation underlying the Group's land is not a property interest protected by the Utah Constitution. Under the Utah Constitution, a takings claim can be sustained only if the claimant can "demonstrate some protectible interest in property." [13] Without such an interest, "there is no property that can provide the basis for compensation." [14] As the North Hayden Group points out, we have characterized this protection as broad by stating that the types of property to which such an interest may attach are "practically unlimited." [15] But the critical characteristic of such an interest is not what kind of property it attaches to, the varying types of which may indeed be without limit, but exactly what kind of interest the plaintiff has in that property.

■ ¶ 19 To enjoy the protections of article I, section 22, an alleged property interest must be more "than a unilateral expectation of continued privileges." [16] We have declined to find a taking in situations where the plaintiffs failed to prove a "vested legally enforceable interest." [17] In contrast, we have acknowledged the protectable interest one acquires when they have obtained a "completed, consummated right for present or future enjoyment." [18]

¶ 20 To establish a vested interest in the amount of water in its soil, the Group characterizes the water table as an indispensable component of other property interests that, it claims, are legally enforceable. Under one characterization, the Group asserts that water in the soil is bound up with the land under which it resides, so that ownership of the land includes entitlement to the water beneath it. Alternatively, the Group posits that soil saturation is a component of the various water rights that its members have lawfully appropriated. This latter characterization draws from the Utah Code provisions that control appropriation of water rights. Specifically, Utah Code section 73–1–3 states that "[b]eneficial use shall be the basis, the measure and the limit of all rights to the use of water in this state." The Group asserts its members' various water rights have become less beneficially useful (because more water is necessary, for example, to irrigate the dry soil). Put differently, even though the Group members are still able to divert water in the full amounts to which their appropriations entitle them, that amount of water does not go as far as it once did.

¶ 21 Neither of these characterizations accurately reflect the law in Utah. The proposition that water in the soil belongs to the corresponding landowner is borne from dicta in the case *Riordan v. Westwood*. [19] In that case, water from the soil percolated through the surface of the land and formed a spring on the appellee's land. [20] The appellee had never taken any action to appropriate this water. [21] The appellant entered onto the

(1913); *Muhlker v. New York & Harlem R. Co.*, 197 U.S. 544, 25 S.Ct. 522, 49 L.Ed. 872 (1905)).

13. *Strawberry Elec.*, 918 P.2d at 877 (internal quotation marks omitted).

14. *Bagford*, 904 P.2d at 1099.

15. *Farmers*, 803 P.2d at 1244 (internal quotation marks omitted).

16. *Strawberry Elec.*, 918 P.2d at 878. *See also Bagford*, 904 P.2d at 1099 ("[T]o create a protectable property interest, a contract must establish

rights more substantial than a unilateral expectation of continued privileges.").

17. *Bagford*, 904 P.2d at 1099.

18. *Smith v. Price Dev. Co.*, 2005 UT 87, ¶ 26, 125 P.3d 945 (internal quotation marks omitted).

19. 115 Utah 215, 203 P.2d 922 (1949).

20. *Id.* at 923.

21. *Id.*

land, diverted the water, and then sought to appropriate the water via an application through the State Engineer's Office.[22] We held that this water was subject to such appropriation and remanded for consideration of the appellant's application.[23]

¶ 22 But in so holding, we engaged in a discussion about the nature of all water diffused through the soil. We stated that

> [w]here ... water is diffused and percolates through the soil so near the surface that without artificial diversion or application it produces plant life and thereby beneficially affects the land, and where its course cannot be traced onto the lands of any person other than the owner of the land where it is found, such water is percolating waters and as such are a part of the soil, they are not public waters, and the right to the use thereof cannot be acquired by appropriation under our appropriation statute.[24]

Speaking even more broadly, we also noted that, where water could not be traced to a particular source, appropriation of that water could not be allowed because it would permit strangers to the land to drain the soil and carry the water away, in spite of the fact that the water was being beneficially used.[25] We noted that permitting this water to be appropriated would put the landowners in an untenable position; appropriation under our statutes required diversion, but the landowners could not artificially divert this water because it was naturally present on their land.[26] Given this situation, we suggested that the water could not be appropriated.[27]

¶ 23 These observations do not control in this case. First, as dicta, they never carried the force of law. *Riordan* upheld the right of a third party to appropriate this water where it came to the surface through a spring in the ground.[28] These observations about the nature of that water while still in the ground were not indispensable to our reasoning, and so were dicta. Second, in cases decided subsequent to *Riordan*, we have construed Utah's appropriation statutes to clearly make such water the subject of appropriation. Prior to 1935, Utah's appropriation statute stated that "water ... whether flowing above or under the ground *in known or defined natural channels*, is hereby declared to be the property of the public." [29] The statutory language thus suggested that water not in such channels was not public and subject to appropriation. In 1935, the reference to "known or defined natural channels" was removed.[30] While concurring in the result, two justices of the court dissented from the court's reasoning in *Riordan* on the basis that this statutory change permitted the appellant to appropriate the water unless the appellee could show an appropriation prior to that date.[31] Although that basis for disposition did not garner a majority of votes in *Riordan*, we have since made it clear that this change in the statute was the culmination of the "whittl[ing] away" of "the absolute control exercised over [percolating waters] by landowner-users." [32] Thus, regardless of the import of our dicta in *Riordan*, it has since been made clear that ownership of land, by itself, does not create an entitlement to the water in the soil. To the extent that lan-

22. *Id.*

23. *Id.* at 930–31.

24. *Id.* at 929.

25. *Id.* at 929–30.

26. *Id.* at 930.

27. *Id.*

28. *See id.* at 931.

29. *See* Revised Stat. of Utah, § 100–1–1 (1933); Water and Water Rights, Chapter 67, § 1, 1919 Utah Laws 177, 177 (emphasis added).

30. *See* Utah Code Ann. § 100–1–1 (1943); Act of March 13, 1935, Chapter 105, § 1, 1935 Utah Laws 195, 195; *see also Riordan*, 203 P.2d at 933–34 (Latimer, J., concurring in part; dissenting in part).

31. *See Riordan*, 203 P.2d at 933–34 (Latimer, J., concurring in part; dissenting in part); *id.*, 203 P.2d at 932–33 (Wolfe, J., concurring in part; dissenting in part).

32. *Provo River Water Users' Ass'n v. Morgan*, 857 P.2d 927, 932–33 (Utah 1993).

guage in *Riordan* suggests that an entitlement to water in the soil flows merely from ownership of land, we take this opportunity to disavow that interpretation.

¶ 24 Regardless of the status of a landowner's rights regarding the use of that water while it remains unappropriated, the landowner clearly does not own that water merely because it is present in the soil. This theory of ownership, therefore, will not support a finding of a protectable interest for purposes of the Utah Constitution.

¶ 25 The North Hayden Group also seeks to characterize the level of soil saturation as a component of the water rights its members have lawfully appropriated, insofar as saturated soil makes their appropriated water more beneficially useful. As support for this proposition, it cites the beneficial use statute, Utah Code section 73–1–3, which states that "[b]eneficial use shall be the basis, the measure and the limit of all rights to the use of water in this state." The Group misapprehends the nature of this statute.

¶ 26 The statutory language on which the Group relies operates as a constraint on appropriation, not a guarantee of future value. That is, an appropriator of water rights may only obtain a right to whatever amount of water has been put to beneficial use ("the basis" and "the measure") and no more than can beneficially be used ("the limit").[33] This is reinforced by the fact that when water rights are conferred so that the water may be put to beneficial use, the right to use that water is still granted in terms of a flow of cubic feet per second and a volume of acre-feet.[34] That is, where a beneficial use is established, water rights are granted in finite quantities, not in open-ended amounts to be evaluated in hindsight based on whether the water was beneficially used. We are aware that a party may contest an application for appropriation of water by demonstrating to the State Engineer that the application will interfere with a more beneficial use of the water.[35] But this alone does not endow an owner of a water right with a legitimate claim of entitlement to any amount of water the owner can beneficially use.

¶ 27 We have previously undertaken an examination of whether beneficial use, without prior appropriation, can form a protectable interest. Indeed, we have previously evaluated the validity of a takings claim where government action diminished soil saturation, and concluded that such a claim could not stand. In *Weber Basin Water Conservancy District v. Gailey,* a water conservancy district installed a reservoir in the Weber River that had the effect of lowering the river's water level.[36] The defendant in the case owned a tract of land adjacent to and near the river, part of which was condemned as part of the conservancy district's plan.[37] In the condemnation action, he challenged the compensation he would be receiving in conjunction with this taking.[38] He argued that he was entitled not only to the value of the condemned land, but also to compensation for the diminution in value of the land he still owned.[39] He alleged that the water table was lowered by virtue of the change in flow of the Weber River. Asserting that he had a protectable interest in this water, he claimed that he was entitled to just compensation for the changed value of his land based on the loss of this water.[40]

¶ 28 In discussing beneficial use in that case, we made two observations that are applicable here. First, we noted that this court has "never gone so far as to base water rights on the mere acceptance of benefits incidental to the presence of water on or

33. *See* Utah Code Ann. § 73–1–3 (2009); *see also Salt Lake City v. Gardner,* 39 Utah 30, 114 P. 147, 150 (1911) ("[A]ppellants should be limited to the amount of water they applied to a beneficial use, and not to an amount they could have claimed or require.").

34. *See* Utah Code Ann. § 73–1–2.

35. *See id.* § 73–3–1.

36. 8 Utah 2d 55, 328 P.2d 175, 175–76 (1958).

37. *Id.* at 176.

38. *Id.*

39. *Id.*

40. *Id.*

adjacent to one's land." [41] We also reaffirmed the proposition from a prior case that "passive acceptance of benefits of such waters by those who had not by any affirmative act appropriated and put the waters to beneficial use, nor complied with statutory requirements to perfect such rights, did not permit them to maintain rights against one who had made an appropriation by diversion." [42] We held that no takings claim could be sustained based on the lowering of the water table for the conservancy district's actions, even where the landowner suffered a diminution in the value of his land.[43] We reaffirm that decision in this case.

¶ 29 *Weber Basin* makes clear that beneficial use of water is not a substitute for an appropriation of water. The Group members have not appropriated water from their soil. And to the extent that the subsurface water makes its way to the Group through its members' established water rights, nothing has been taken because Group members still receive the entire amount to which they are entitled under these appropriations. As such, the fact that this water has gratuitously made their lawfully appropriated water more useful to them does not give rise to a protectable interest in the continued use of that water.

¶ 30 Stripped to its essence, the Group's claimed interest in the water table is analogous to the "unilateral expectation of continued privileges" that we have held is insufficient to support a takings claim.[44] Without having lawfully appropriated this water, the Group lacked a claim of entitlement to the continued presence of water in its soil. Without this degree of entitlement, the Group's interest does not fall within the pro-

tections of article I, section 22 of the Utah Constitution.

*B.  The Group's Claimed Interest in the Level of Soil Saturation Is Also Not Protected by the United States Constitution*

¶ 31 The Fifth Amendment to the United States Constitution also does not require that compensation be paid to the Group. Like the Utah Constitution, the federal constitution does not provide protection against every government action that might have negative economic consequences. The United States Supreme Court has "accordingly recognized, in a wide variety of contexts, that government may execute laws or programs that adversely affect recognized economic values." [45] Rather, as mentioned, in order to be protected by the Fifth Amendment, an economic interest must be "sufficiently bound up with the reasonable expectations of the claimant to constitute 'property' for Fifth Amendment purposes." [46] When the government has neither invaded nor appropriated a claimant's property, and where government action falls short of denying all economic value, the requirement that the claimed interest be legally protected is made manifest by the Court's inquiry into "a complex of factors" that includes the claimant's "reasonable investment-backed expectations." [47]

¶ 32 In determining whether the Group's interests are "sufficiently bound up" with its "reasonable expectations" that the interests might qualify as property for purposes of the Fifth Amendment, we find a useful contrast in two cases decided by the Supreme Court. The first, *United States v. Cress,* is a case heavily relied upon by the North Hayden

---

41.  *Id.* at 179.

42.  *Id.* at 180 (citing *Hardy v. Beaver County Irrigation Co.*, 65 Utah 28, 234 P. 524 (1924)).

43.  *Id.*

44.  *Strawberry Elec. Serv. Dist. v. Spanish Fork City*, 918 P.2d 870, 878 (Utah 1996).

45.  *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).

46.  *Id.* at 124–25, 98 S.Ct. 2646 (citing *United States v. Willow River Power Co.*, 324 U.S. 499, 65 S.Ct. 761, 89 L.Ed. 1101 (1945); *Demorest v. City Bank Farmers Trust Co.*, 321 U.S. 36, 64 S.Ct. 384, 88 L.Ed. 526 (1944); *United States v. Chandler–Dunbar Water Power Co.*, 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063 (1913); *Muhlker v. New York & Harlem R. Co.*, 197 U.S. 544, 25 S.Ct. 522, 49 L.Ed. 872 (1905)).

47.  *See Palazzolo v. Rhode Island*, 533 U.S. 606, 607, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001).

Group, wherein mill owners obtained riparian rights in the river adjacent to the land where the mill was located.[48] They diverted water from the river so that water flowing through several channels would power the mill.[49] When the federal government dammed the river, the water level increased, and the flow of water slowed so that it became insufficient to drive the mill.[50] The Court affirmed an award in favor of the mill owners for the depreciation of the value of the mill.[51] In doing so, the Court relied on the property rights created by state law: "Under the law of Kentucky, ownership of the bed of the creek, subject only to the natural flow of the water, is recognized as fully as ownership of the mill itself." [52]

¶ 33 In a subsequent case with strikingly similar facts, *United States v. Willow River Power Co.,* the Court concluded that no compensation was owed to a mill operator.[53] In *Willow River,* a mill was built between the St. Croix river and one of its tributaries, the Willow River.[54] The St. Croix river, in turn, flowed into the upper Mississippi river.[55] The federal government dammed the Mississippi near the mouth of the St. Croix and thereby caused the water level in the St. Croix to rise.[56] This rise in the water level of the St. Croix decreased the efficiency of the mill situated between the Willow and St. Croix rivers.[57] The Court concluded that the mill operator had no protectable interest in maintaining the level of water in the St. Croix.[58]

¶ 34 The factual distinction that led to these differing results was the navigable nature of the St. Croix and Mississippi rivers involved in the latter case.[59] The Court examined the long history of public authority over navigable waters and concluded that the necessity of government control over navigable waters required that the rights of riparian owners be subservient to that control.[60] Because of this subservience, the riparian rights granted to the mill operators in *Willow River* simply did not include the right to prevent the federal government from enhancing the navigability of the St. Croix and Mississippi rivers. As the Court stated, "[w]here these interests conflict they are not to be reconciled as between equals, but the private interest must give way to a superior right, or perhaps it would be more accurate to say that as against the Government such private interest is not a right at all." [61] In deciding that no compensation was required for the diminution in value of this mill, the Court applied the following standard: "[n]ot all economic interests are 'property rights'; only those economic advantages are 'rights' which have the law back of them, and only when they are so recognized may courts compel others to forbear from interfering with them or to compensate for their invasion." [62]

¶ 35 For purposes of resolving the issues in the case at hand, the critical feature of these cases is the relationship between state law and the word "property" in the Fifth Amendment. In *Cress,* the Court relied on the protections afforded by Kentucky law to

48. 243 U.S. 316, 317–18, 37 S.Ct. 380, 61 L.Ed. 746 (1917).

49. *Id.*

50. *Id.* at 318–19, 37 S.Ct. 380.

51. *See id.* at 332, 37 S.Ct. 380.

52. *Id.* at 330, 37 S.Ct. 380.

53. 324 U.S. 499, 510–11, 65 S.Ct. 761, 89 L.Ed. 1101 (1945).

54. *Id.* at 499–500, 65 S.Ct. 761.

55. *Id.* at 501, 65 S.Ct. 761.

56. *Id.*

57. *Id.*

58. *See id.* at 509–11, 65 S.Ct. 761.

59. *See id.* at 506–09, 65 S.Ct. 761.

60. *Id.* at 507–09, 65 S.Ct. 761.

61. *Id.* at 510, 65 S.Ct. 761.

62. *Id.* at 502, 65 S.Ct. 761. We are aware that our system of water rights differs from the riparian system at issue in these cases. But the crux of these decisions is that constitutional protection must be tied to something that is protected by the law. Thus, we find the reasoning of these cases applicable even in determining the bounds of our system of prior appropriation.

determine that the mill operator had a property interest in the level of water in the nearby river.[63] In contrast, in *Willow River*, the navigable nature of the river limited the amount of protection that the mill operators could invoke under state law. As the Court indicated, the level of water in the river was "a privilege or a convenience, enjoyed for many years, permissible so long as compatible with navigation interests, but ... not an interest protected by law when it becomes inconsistent with plans authorized by Congress for improvement of navigation." [64]

¶ 36 Because of the interrelationship between Fifth Amendment protection and principles of state law, we conclude that the North Hayden Group's claim also fails under the United States Constitution. For the reasons, discussed above, that the Group has no claim of entitlement that would give rise to a protectable interest under article I, section 22 of the Utah Constitution, the Group also does not have an interest sufficiently supported by state law to be treated as property for the purposes of the Fifth Amendment. Specifically, as indicated in our case law, the Group did not appropriate the water in its soil. And the mere fact that the presence of water in the soil allowed the Group to more beneficially use other water does not legally entitle the Group to be compensated for a reduction in the level of the water table. We cannot conclude that the Group's interest in the level of water in its soil was sufficiently bound up with reasonable expectations that the Group is entitled to compensation for changes to the water level.

¶ 37 The North Hayden Group also attempts to characterize its members' property interest as an interest in the value of their land. This turns the relevant inquiry on its head. Certainly, a takings claim based on economic injury can only exist if the value of some property is diminished. But only if this diminution is the result of interference with a protectable interest will the claim be sustainable as a matter of constitutional law. The relevant constitutional provisions do not protect against all government action that might negatively impact the value of land;

they protect against government interference in protected property interests. Where no such interest exists, a change in the value of land is not sufficient, standing alone, to give rise to a takings claim. Because we find that the North Hayden Group has no protectable interest in the water table underlying its members' land, we affirm the district court's grant of summary judgment on this issue in favor of the City.

## II. THE NORTH HAYDEN GROUP'S CLAIM FOR INTERFERENCE WITH WATER RIGHTS, WHILE NOT BARRED BY UTAH'S GOVERNMENTAL IMMUNITY STATUTES, NEVERTHELESS FAILS AS A MATTER OF LAW

¶ 38 The district court did not err in granting summary judgment in favor of the City on the Group's claim for interference with water rights, but it did err in holding that the claim was barred by the Governmental Immunity Act of Utah. With regard to the Group's interference claim, the district court granted summary judgment in favor of the City on two alternative grounds. First, it concluded that the Group could not prevail on its interference claim because the City's actions simply had not impacted the Group's water rights. Second, the district court concluded that, under the Governmental Immunity Act of Utah, the City was immune from suit for its complained-of conduct. Although the district court correctly concluded that the Group could not prevail on its interference claim, it incorrectly concluded that the City was immune from suit. We first address the issues related to governmental immunity before addressing the merits of the Group's interference claim.

*A. By Complaining of Roosevelt City's Reckless Indifference and Disregard of the Group's Rights, the North Hayden Group Adequately Alleged Negligence for Purposes of the Governmental Immunity Act*

¶ 39 The district court incorrectly concluded that the North Hayden Group's

**63.** *See Cress,* 243 U.S. at 330, 37 S.Ct. 380.

**64.** *See Willow River,* 324 U.S. at 509, 65 S.Ct. 761.

interference claim was barred by the Governmental Immunity Act of Utah (the "Act"). This Act codifies the proposition that the state is immune from suit, but also enacts a number of exceptions to this immunity that permit plaintiffs to sue government entities for specific conduct.[65] Central to the case at hand, one such exception permits the government to be sued for negligent acts.[66]

¶ 40 In its complaint, the North Hayden Group alleged that the City's actions "were intentional, willful, and malicious, or, at least manifested a knowing and reckless indifference for and disregard of the [Group's] rights in [its] property." The cause of action for interference does not explicitly refer to the City's conduct as negligent. The district court concluded that this description does not constitute negligence under the Act, reasoning that "[i]f intentional and reckless conduct also included negligence, then it would make little sense for the Legislature to draw a distinction for waiving immunity only for negligence." The North Hayden Group argues that in so ruling, the district court erred. We agree with the Group.

██ ¶ 41 The Act provides that all government entities "are immune from suit for any injury that results from the exercise of a governmental function."[67] Determining whether a government entity's action is immune from suit requires a three-step analysis: first, we must determine whether the activity performed was a government function; second, if so, we must determine whether the Act waives immunity for that conduct; and third, if immunity is waived, we must determine whether the Act contains any exception to that waiver that would result in a retention of immunity.[68]

¶ 42 The Act defines government function as any activity, undertaking, or operation of a governmental entity, and includes a "failure to act."[69] The district court found, and neither party disputes, that the City was performing a government function when it pumped and used water for municipal purposes.

¶ 43 With regard to the second step in the analysis, the Act contains several waivers of governmental immunity, including one section that waives immunity for "injury proximately caused by a negligent act or omission of an employee committed within the scope of employment."[70] This is the provision on which the Group relies. For the Group's claim not to be barred, then, the Group's allegation of "reckless indifference . . . and disregard" must be encompassed by this provision.

¶ 44 In other contexts, this court has stated that negligent conduct may include conduct that manifests "a knowing and reckless indifference toward the rights of others."[71] For instance, we have held that simple negligence will not support a claim for punitive damages, but that negligence that arises to the level of knowing and reckless indifference will support such an award.[72] Indeed, we have concluded that, "in Utah gross negligence is equated with reckless disregard."[73] While negligence generally connotes the failure to observe due care, gross negligence and recklessness are "the failure to observe even slight care."[74]

65. *See* Utah Code Ann. §§ 63G-7-201, -301 (2008). The Governmental Immunity Act has been recodified since the complaint was filed in this case. The provisions at issue here have either not changed, or have changed very slightly. Without expressing an opinion on whether the current versions of these statutes might operate differently than their predecessors, we cite to the current versions for the sake of convenience.

66. *See id.* § 63G-7-301(4).

67. *Id.* § 63G-7-201(1).

68. *Ledfors v. Emery County Sch. Dist.*, 849 P.2d 1162, 1164 (Utah 1993).

69. Utah Code Ann. § 63G-7-102(4).

70. *Id.* § 63G-7-301(4).

71. *Diversified Holdings, L.C. v. Turner*, 2002 UT 129, ¶ 29, 63 P.3d 686.

72. *Daniels v. Gamma W. Brachytherapy, LLC*, 2009 UT 66, ¶¶ 41-43, 221 P.3d 256.

73. *Id.* ¶ 43.

74. *Id.* (quoting *Atkin Wright & Miles v. Mountain States Tel. & Tel. Co.*, 709 P.2d 330, 335 (Utah 1985)).

¶ 45 Further, where complaints are capable of more than one construction, we have, in some circumstances, required that ambiguities be construed in a manner that sustains the complaint. Specifically, where a complaint could reasonably state a cause of action that sounds in either contract or tort, and where one of those causes of action would be barred by a statute of limitations and the other would not, we have indicated that the complaint must be construed to state the cause of action that would not be barred.[75] We observed, "[t]he action, in the case of doubt, should be construed to uphold it rather than to defeat it, as the court presumes the pleader's purpose is to serve his best interest."[76]

¶ 46 We are satisfied that an allegation of reckless indifference fairly construed, encompasses negligence. Therefore, we disagree with the district court's finding that this claim does not fall within the Act's waiver of immunity for negligent acts or omissions. Although the North Hayden Group's complaint did not expressly allege negligence with respect to its interference claim, its allegation that the City's activities manifested "knowing and reckless indifference for and disregard of" property rights encompasses an allegation of negligence and falls within the waiver of governmental immunity for negligent acts or omissions under section 63–30–10 of the Act.[77]

¶ 47 Lastly, although the Act provides several exceptions to the waiver of immunity, which, if applicable, result in a retention of immunity,[78] the City has not asserted that an exception to the waiver of immunity applies. Therefore, we do not reach the issue of whether the Act contains an exception to the waiver of immunity that might apply in this case.

## B. The District Court Correctly Concluded That the North Hayden Group's Claim for Interference With Water Rights Fails as a Matter of Law

¶ 48 Although the Group's claim for interference with water rights is not barred by the Governmental Immunity Act of Utah, the district court did not err in granting summary judgment in favor of the City. As mentioned, the district court also granted summary judgment against the North Hayden Group on the alternative basis that the Group could not prevail, as a matter of law, on a claim for interference with water rights. Such a claim is based on "obstructing or hindering the quantity or quality of an *existing water right*."[79] In determining whether an appropriator's rights have been interfered with, we have stated "the inquiry regarding interference focuses on actual interference in the quantity or quality of water to which the prior appropriator is entitled."[80] Put simply, to prevail on claims for interference with water rights, plaintiffs must show that they have lawfully appropriated a certain quantity of the water, and that the defendant's actions are obstructing or hindering their ability to obtain that water.

¶ 49 It is useful to articulate precisely the basis for the Group's complaint. Construed in the light most favorable to the Group, the facts in this case establish that the Group members have various appropriated water rights. The facts also establish that the Group members are able to exercise these rights to their fullest potential; the Group concedes that all of its members still draw all the water to which they are entitled under these rights. Thus, the Group's claim cannot be based on interference with these rights. Further, the facts establish that the City is

---

**75.** *Juab County Dep't of Pub. Welfare v. Summers,* 19 Utah 2d 49, 426 P.2d 1, 3 (1967).

**76.** *Id.* (internal quotation marks omitted).

**77.** The Group alternatively argues that its claim falls under another exception set forth in the Governmental Immunity Act. Specifically, Utah Code section 63G–7–301(3)(a)(ii) permits government entities to be sued for injuries caused by "any defective or dangerous condition of a public building, structure, dam, reservoir, or other public improvement." Because we find that Utah

Code section 63G–7–301(4) permits the Group's suit, we do not address this alternative argument.

**78.** *See* Utah Code Ann. § 63G–7–301(5).

**79.** *Wayment v. Howard,* 2006 UT 56, ¶ 13, 144 P.3d 1147 (emphasis added).

**80.** *Salt Lake City v. Silver Fork Pipeline Corp.,* 2000 UT 3, ¶ 28 n. 10, 5 P.3d 1206, *abrogated on other grounds by Otter Creek Reservoir Co. v. New Escalante Irrigation Co.,* 2009 UT 16, ¶¶ 11–13, 203 P.3d 1015.

not diverting any more water than it has appropriated. Even construed in the light most favorable to the plaintiffs, the facts establish that the City is doing no more than exercising its right to divert a certain quantity of water from a certain point.

¶ 50 Like the Group's takings claim, its claim of interference is based on the alternative theories that its members' water has become less useful, because more water is necessary to successfully irrigate their land, or that they are entitled, by virtue of their ownership of land, to the water in the soil. For essentially the same reason that the Group does not have a protectable property interest in this water, it also cannot rely on these theories to state a claim of interference: the Group members are simply not the owners of the water in their soil. Certainly, the changes in the underlying water table have made the water that the Group members have appropriated even more important. But it has not changed the amount to which they are entitled, and the City's use of its lawfully appropriated water has not hindered their ability to obtain their appropriated water.

¶ 51 The Group cites a number of cases that it argues support its position, but our review of these cases confirms our conclusion that, without obstruction of an established water right, no interference claim can be sustained. In *Current Creek Irrigation Co. v. Andrews*, we examined a situation where the pumping of water from a basin lowered the water table in the surrounding area and made nearby springs and wells less productive.[81] We upheld a finding of interference, stating that "[w]e have consistently enjoined the lowering of the static head pressure which had the effect of preventing a prior user from continuing a beneficial use of underground waters."[82] But in *Current Creek*, all of the plaintiffs had validly appropriated the water that was being obstructed.[83] Thus,

our holding in that case merely confirms that a claim of interference can be sustained where a junior appropriator lowers the water table in a manner that hinders the diversion of water by a senior appropriator. In spite of our use of the word "user," instead of the word "appropriator," that case cannot be read to extend to any person who puts water to use.

¶ 52 The rule that a finding of interference depends on a valid appropriation also distinguishes *Salt Lake City v. Gardner*[84] and *Kano v. Arcon Corp.*[85] from the instant case. As in *Current Creek*, in both *Gardner* and *Kano* we sustained claims of interference only after first finding that the plaintiffs had appropriated the water right at issue.[86]

¶ 53 We take this opportunity to clarify the boundaries of the cause of action for interference with water rights. Although our cases in this arena may not have emphasized this point in the past, this cause of action can be invoked only by a party with an enforceable water right. Our prior discussion with regard to the nature of the North Hayden Group's property interest makes clear that its members have no such enforceable right with regard to their soil saturation or the level of the water table. With regard to their various water rights, the undisputed facts show that the Group members are capable of obtaining all of the water to which they are entitled in the same manner in which they have been diverting it. As such, the district court properly granted summary judgment in favor of the City with regard to the Group's interference claim.

### III. THE DISTRICT COURT ERRED IN CONCLUDING THAT ROOSEVELT CITY OWED NO DUTY TO THE GROUP IN ITS MANNER OF DIVERTING WATER

¶ 54 The District Court incorrectly concluded that the North Hayden Group's negli-

---

81. 9 Utah 2d 324, 344 P.2d 528, 529–30 (1959).

82. *Id.* at 531.

83. *See id.* at 529.

84. 39 Utah 30, 114 P. 147 (1911).

85. 7 Utah 2d 431, 326 P.2d 719 (1958).

86. *See Kano*, 326 P.2d at 720 ("It appears that by appropriation to a beneficial use, and by court decree, the plaintiffs ... acquired rights to use [the water at issue]." (citation omitted)); *Gardner*, 114 P. at 149 (relying on court decree that appellants were prior appropriators before examining whether actions of appellees interfered with appellants' water rights).

gence claim was barred by the statute of limitations and that the City owed the Group no duty of care with regard to the method the City used to divert water pursuant to its established right. With regard to the Group's negligence claim, the district court granted summary judgment in favor of the City on two alternative grounds. First, it held that the Group's claim was barred by the relevant statute of limitations. Although the Group argued that the continuing tort doctrine should operate to toll the statute of limitations, the district court rejected this argument.[87] Second, the district court concluded that the Group's negligence claim must fail as a matter of law because the City owed it no duty to preserve the water table at historic levels. We address each of these issues in turn.

*A. The Group's Claim of Negligence Is Not Barred by the Statute of Limitations Because Roosevelt City's Pumping of the Wells Qualifies as a Continuing Tort*

¶ 55 The parties do not dispute that the drop in the water table resulting from the City's drilling and use of the wells was apparent in the early 1990s. Based on this, the City argues that any relevant statute of limitations has long since expired on all of the North Hayden Group's claims for damages related to the drilling or pumping of the wells, and that these claims are therefore time barred. The North Hayden Group asserts, however, that the City's ongoing pumping of the wells constitutes a continuing tort, which exempts these claims from the otherwise applicable statute of limitations. Consequently, the North Hayden Group contends that the district court erred in concluding that its negligence claim was barred by the applicable statute of limitations. We agree.

¶ 56 In general, "the statute of limitations begins to run when the cause of action accrues."[88] The continuing tort doctrine provides an exception to this general rule, tolling the statute of limitations while the tortious conduct continues unabated.[89] We have recognized the continuing tort rule in a variety of situations, including nuisance, trespass, intentional infliction of emotional distress, and continuous negligent medical treatment.[90] As the district court correctly noted, none of these decisions has yet extended the rule to a cause of action for negligence. But given our recognition of this exception in closely related claims, we agree with the North Hayden Group that tolling a statute of limitations because of a defendant's continuing negligence is a natural extension of the continuing tort doctrine.

¶ 57 In the context of nuisance and trespass, we have considered conduct to be a continuing tort where the conduct may be discontinued at any time.[91] Furthermore, we have classified a trespass as either permanent or continuing by looking "solely to the *act* constituting the trespass, and not to the *harm* resulting from the act."[92] Because multiple trespasses give rise to multiple

---

87. The district court found all of the Group's claims barred by the applicable statute of limitations, not just its claim for negligence. Given our disposition of the other issues in this case, we need not determine whether the continuing tort doctrine, or some analogous doctrine, might have operated to preserve the Group's other claims.

88. *Retherford v. AT & T Commc'ns of the Mountain States, Inc.*, 844 P.2d 949, 975 (Utah 1992). Furthermore, " 'mere ignorance of the existence of a cause of action does not prevent the running of the statute of limitations.' " *Walker Drug Co. v. La Sal Oil Co. (Walker I)*, 902 P.2d 1229, 1231 (Utah 1995) (quoting *Warren v. Provo City Corp.*, 838 P.2d 1125, 1128–29 (Utah 1992)).

89. 51 Am.Jur.2d *Limitations of Actions* § 168 (2000).

90. *See, e.g., Cabaness v. Thomas*, 2010 UT 23, ¶¶ 26–27, 232 P.3d 486 (extending the doctrine of continuing torts to a cause of action for intentional infliction of emotional distress); *Walker I*, 902 P.2d at 1233 (recognizing a cause of action for a continuing nuisance or trespass); *Peteler v. Robinson*, 81 Utah 535, 17 P.2d 244, 249 (1932) (recognizing a cause of action for continuous negligent medical treatment).

91. *Walker I*, 902 P.2d at 1232.

92. *Breiggar Props., L.C. v. H.E. Davis & Sons, Inc.*, 2002 UT 53, ¶ 10, 52 P.3d 1133 (citing *Walker Drug Co. v. La Sal Oil Co. (Walker II)*, 972 P.2d 1238, 1246 n. 9 (Utah 1998)).

causes of action, the statute of limitations "begins to run anew with each act." [93] Accordingly, we have characterized a trespass as "permanent" when "the act or acts of trespass have ceased to occur," and we have characterized a trespass as "continuing" when "multiple acts of trespass have occurred, and continue to occur." [94] Our decision today is consistent with this principle.

¶ 58 The City's continued pumping of the wells is the relevant conduct for purposes of determining the applicable statute of limitations, and it is properly characterized as continuing. The City argues that even if this court were to extend the continuing tort doctrine to causes of action for negligence, the North Hayden Group's claim would still fail because the Group's damages stem from the City's one-time drilling of wells in an unconfined aquifer, as opposed to the continued pumping of this aquifer. Thus, the City argues that because the relevant act for purposes of determining the applicable statute of limitations was the initial drilling of the wells, any alleged negligence should be considered a permanent tort, dating back to the 1990s, which is outside the applicable statute of limitations.

¶ 59 Although the drilling of the wells may have been the City's first contribution to the Group's alleged harm, each time the City pumps the wells, this harm is aggravated. It is not the existence of the wells in the abstract or the way they were drilled or designed that is allegedly negligent. Rather, the Group alleges that its damages are the aggregate result of years of the City's pumping water in a manner that unreasonably disregards the potential harm that will flow to nearby landowners. Further, as with other kinds of conduct that we have held to be a continuing tort, the pumping may be discontinued at any time and the alleged damage

will be abated. [95] Therefore, the City's actions are properly considered continuing rather than permanent and the statute of limitations has been tolled. We therefore reverse the portion of the district court's judgment that concludes that the North Hayden Group's negligence claim was barred by the statute of limitations.

*B. The District Court Erred in Holding That Roosevelt City Owed the North Hayden Group No Duty to Exercise Due Care in Extracting Its Appropriated Water From Its Approved Point of Diversion*

¶ 60 The district court concluded that the City owed no duty to the North Hayden Group. It found the notion inimical to Utah's water law, reasoning that it would permit the Group to "control indirectly water which they had no right to control directly." We disagree with the notion that this would usurp our laws of prior appropriation. Our cases have consistently affirmed that property rights are not absolute. Rather, causes of action, like negligence or nuisance, that invite judicial review of the manner in which a party exercises its property rights are a critical component of property law in this state.

¶ 61 In the more general context of land use, we have stated quite plainly, "every person has a right to use his own property as he sees fit *so long as that use does not invade the rights of his neighbor unreasonably and substantially.*" [96] In another case, where we weighed the rights of a landowner and a water rights holder, we explained the correlative nature of property rights and the corresponding role for courts in reviewing contests between property owners. [97] In *N.M. Long & Co. v. Cannon–Papanikolas Construction Co.,* we stated,

93. *Id.* ¶ 11.

94. *Id.*

95. *See id.* ¶ 8 (" 'In the case of a continuing trespass or nuisance, the person injured may bring successive actions for damages until the nuisance [or trespass] is abated, even though an action based on the original wrong may be barred, but recovery is limited to actual injury suffered within the three years prior to commencement of each action.' " (alteration in original) (quoting *Walker I,* 902 P.2d at 1232)). The North Hayden Group concedes that its recovery will be limited by this rule in this case.

96. *Johnson v. Mt. Ogden Enter.,* 23 Utah 2d 169, 460 P.2d 333, 336 (1969) (emphasis added).

97. *N.M. Long & Co. v. Cannon–Papanikolas Constr. Co.,* 9 Utah 2d 307, 343 P.2d 1100 (1959).

it requires little imagination to realize that rights to use property cannot be absolute. If one holds property by force alone he is always subject to being dispossessed by force. If he holds it by rule of law this involves the agreement of everyone else. To the extent they are required to respect his rights, he must similarly respect theirs.[98]

We also observed, "[a]s populations continue to increase and society becomes more complex, pressures increase in connection with the use of land and resources."[99] This led us to conclude,

> [t]he consequence of this is greater necessity for restrictions upon the manner in which property rights may be exercised. Just as the right to hold, use and enjoy property is by the collective consent of society, as represented by the law, the law within its proper limits may also impose such controls thereon as are necessary in the interest of the common welfare.[100]

In that case, we held that where landowners held title to swampy land, they should be permitted to install a drainage system to make it possible to develop the land.[101] We permitted the installation of the drainage system even though it would lower the nearby water table and negatively impact the diversion of water for nearby holders of water rights.[102]

¶ 62 Although in that case we upheld the actions that lowered the water table, we find that reasoning fully applicable to a claim to prevent actions that might lower the water table. Indeed, whatever the pressures felt as a result of a growing society in 1959, we believe those pressures, and the corresponding "necessity for restrictions upon the manner in which property rights may be exercised," are only greater in 2010. What is important is not the direction the water table is heading, but whether the actions that caused that change were reasonable and undertaken with due care for the rights of others.

¶ 63 Further, our cases involving interference with water rights have adopted a rule of reasonableness that reflects the necessity of weighing the values and costs associated with a particular means of using water. Specifically, our statutes grant junior appropriators the right to interfere with water rights, if they so choose, on the condition that they bear the cost of "replacement."[103] In *Wayman v. Murray City*, the city increased the efficiency of its wells so that it could then consistently draw the entire amount of water to which it was entitled.[104] This had the effect of diminishing the water table, and preventing the plaintiffs in that case from obtaining their appropriated amounts of water without modification of their wells.[105]

¶ 64 The district court found that the city had impaired the plaintiffs' water rights and ordered that it replace the value of the water its well would prevent the plaintiffs from taking.[106] We reversed this decision. Instead of requiring replacement in all instances, we adopted a "rule of reasonableness," under which plaintiffs will not be eligible for replacement unless their means of diversion are reasonable.[107] In so holding, we stated that "[w]hile the problem here under discussion may seem novel, pursued to its fundamentals, it is in essence the same issue that is confronted so frequently in the law: the right of the individual as compared to the rights of the group...."[108]

¶ 65 Just as each of these cases required us to examine the competing interests of property owners, we find that the instant case cannot be resolved by holding, as did

98. *Id.* at 1102.

99. *Id.*

100. *Id.*

101. *Id.* at 1101, 1103.

102. *Id.*

103. *See* Utah Code Ann. § 73–3–23 (2009).

104. *Wayman v. Murray City Corp.*, 23 Utah 2d 97, 458 P.2d 861, 862–63 (1969).

105. *See id.* at 863.

106. *See id.* at 862.

107. *Id.* at 865–66.

108. *Id.* at 865.

the district court, that the City's right to divert its appropriated quantity of water is absolute. Indeed, we believe it is apparent that if the City had been negligently drilling its wells and its machinery had injured someone, the mere appropriation of the water right would not insulate the City from liability. Similarly, appropriation of a water right would not immunize the City if, while negligently pumping water from the wells, it caused nearby land to flood. The mere appropriation of a water right cannot be held to relieve the City from its obligation to exercise care in how it obtains the water to which it is lawfully entitled. Accordingly, we hold that the City owes, and did owe, a duty of reasonable care to landowners who will foreseeably be harmed by the method the City uses to obtain its water.

¶ 66 We acknowledge that, in a sense, this permits the North Hayden Group to control the City's means of pumping, insofar as the injured party can seek judicial review of, and relief from, the conduct that injures it. But this sort of control is inherent in the nature of property rights:

> Inasmuch as ... rights are so assured and protected only by the authority of the state, it is both logical and necessary that the rights of each individual should be to some degree subordinate to and correlated with reasonable conditions and limitations thereon which are established by law for the general good.[109]

¶ 67 Because the City prevailed in the district court on a motion for summary judgment, if there remain any disputed material facts we must remand for further proceedings. Clearly, key facts remain disputed in this case. The Group has consistently alleged that the City could ameliorate the adverse effects being suffered by Group members simply by drilling its wells deeper. If the City did so, its wells would tap into the confined Duchesne River Formation. Because this confined aquifer is not replenished by water flowing through the soil, the Group contends that the water table would naturally replenish itself and the harms caused by the City's mining of the Neola–Whiterocks aquifer would abate.

¶ 68 If the Group is correct, and if this alternative means of diverting water is reasonable under the circumstances, the Group will be able to prevail on its negligence claim. Whether it is reasonable for the City to tap into the Duchesne aquifer is an intricate issue that was not reached by the district court and we cannot resolve it for the first time on appeal. The quantity of water in the Duchesne River Formation may be insufficient to provide the water to which the City is entitled. The speed with which the Duchesne aquifer is naturally replenished may be insufficient to meet the City's needs. The costs and practical problems associated with drilling a deeper well may also make it unreasonable for the City to be required to do so. But if, as the Group alleges, acres of farmland can be restored to productivity by a relatively minor change to the City's system for extracting water, it would be unreasonable for the City not to implement such a change.

## CONCLUSION

¶ 69 Although we affirm the district court's grant of summary judgment with regard to the Group's takings and interference claims, we hold that the district court erred in granting summary judgment in favor of Roosevelt City with regard to the Group's negligence claim. First, we agree with the district court's conclusion that the North Hayden Group cannot prevail on its takings claim because the Group's interest in the water underlying its members' lands is insufficient to garner protection under the relevant constitutional standards. Second, although we find that the Group's interference claim is not barred by the Governmental Immunity Act of Utah, we affirm the district court's grant of summary judgment in favor of the City on the merits of that claim. Finally, we hold that the district court incorrectly concluded that the City owed no duty to the North Hayden Group to exercise its water right in a manner that is reasonable under the circumstances. We also reverse the district court's alternative basis for granting summary judgment—that the Group's claims

109. *Id.*

were barred by the statute of limitations—because we find that the conduct forming the basis of the Group's complaint constituted continuing negligence sufficient to toll the statute of limitations. Thus, we affirm in part, reverse in part, and remand for further proceedings.

¶ 70 Chief Justice DURHAM, Justice WILKINS, Justice PARRISH, and Justice NEHRING concur in Associate Chief Justice DURRANT's opinion.